Ronald G. ULLRICH, Plaintiff,

v.

CEXEC, INC., Defendant.

Case No. 1:16–cv–570

United States District Court,
E.D. Virginia,
Alexandria Division.

Signed 02/09/2017

516

517

Nicholas Wyckoff Woodfield, Robert Scott Oswald, The Employment Law Group PC, Washington, DC, for Plaintiff.

Steven W. Ray, Amanda Sue Disanto, Isler Dare PC, Vienna, VA, for Defendant.

## ORDER

T. S. Ellis, III, United States District Judge

Plaintiff Ronald Ullrich, a 55–year old male, filed this Age Discrimination in Employment ("ADEA") and Americans with Disabilities Act ("ADA") claim after defendant CEXEC, Inc. demoted him in May

2014 and then terminated him in September 2015. Plaintiff contends that defendant demoted and terminated him because of his age and perceived disability, and that defendant also retaliated against him for filing an internal harassment complaint and an EEOC complaint. Following full discovery, defendant filed a motion for summary judgment. Defendant's motion has been fully briefed and argued orally, and as a result the matter is now ripe for disposition.

## I.

The entry of summary judgment is appropriate only where there are no genuine disputes of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). That is the situation here. Pursuant to Local Rule 56(B) and the Rule 16(b) scheduling order, a motion for summary judgment must contain a separately captioned section listing in numbered-paragraph form all material facts as to which the movant contends no genuine dispute exists. *See Ullrich v. CEX-EC, Inc.*, No. 1–16–cv–570 (E.D. Va. Aug. 30, 2016) (Doc. 14). The Local Rule and scheduling order further provide that the non-movant must include "a separately captioned section within the brief addressing, in numbered-paragraph form corresponding to the movant's section, each of the movant's enumerated facts and indicating whether the non-movant admits or disputes the fact with appropriate citations to the record." *Id.* Finally, the scheduling order states that the "Court may assume that any fact identified by the movant as undisputed in the movant's brief that is not specifically controverted in the non-movant's brief in the manner set forth above is admitted for the purpose of deciding the motion for summary judgment." *Id.*

Defendant complied with Local Rule 56(B) and the scheduling order. Plaintiff only partially complied by stating that plaintiff does not dispute 47 of defendant's 67 undisputed material facts; for the additional 20 facts asserted by defendant, plaintiff adds additional facts that do not specifically dispute defendant's asserted facts. Plaintiff further goes on to provide his own statement of undisputed facts, which consists of 12 pages of facts in narrative form. Plaintiff's alternative statement of facts not only overlaps with defendant's statement, but its narrative form serves to frustrate identifying which material facts are genuinely in dispute. Such alternative narratives do not comply with Local Rule 56(B). *See Integrated Direct Marketing, LLC v. May*, 129 F.Supp.3d 336, 345 (E.D. Va. 2015) (concluding that a party's "narrative version of its own interpretation of the facts fails to comply with Local [ ] Rule 56(B), largely contains argument, and makes it difficult to determine exactly which material facts are disputed").

As a result, the statement of undisputed material facts listed below is based on the parties' four-page joint statement of undisputed material facts and defendant's statement of undisputed material facts, the majority of which plaintiff agrees to or does not specifically dispute. As for plaintiff's alternative narrative of facts, that narrative has been scoured for facts that might be viewed as in conflict with the facts stated here; where such disputes appear, the plaintiff's facts are either immaterial or not supported by admissible record evidence.

1. Defendant CEXEC was founded in 1976.

2. Defendant provides professional support and management consulting services to public sector clients.

3. Since 2010, defendant has focused on providing professional services.

4. Douglas Rhodes served as President, Chief Executive Officer ("CEO"), and Chairman of the Board from 1976 to 2011.

5. In 2011, Douglas Rhodes' son, Weston Rhodes, became President and CEO of defendant.

6. Defendant's current management team includes: (1) Weston Rhodes, President and CEO, age 44, hired 5/5/2003; (2) Gail Parmentier, Senior Vice President and Chief Financial Officer, age 69, hired 8/10/1992; (3) Phil Beliveau, Vice President of Federal Aviation Administration ("FAA") Programs and Services, age 68, hired 6/10/1993; (4) Rob O'Neil, Vice President of Professional Services, age 44, hired 3/25/2003; (5) Jo Ann Sell, Vice President of Customer Relations, age 68, hired 1/4/1983; (6) Henry Boardman, Vice President of Operations, age 71, hired 7/17/1987; (7) Barry Murphy, Senior Vice President, age 74, hired 7/25/1988; (8) Ray Huber, Vice President of Contracts and Financial Services, age 62, hired 5/10/2007.

7. Defendant currently employs about 70 people, 22 of whom are over 60 years old and 14 of whom are between 50 and 59 years old.

8. The average age of defendant's work force is 50 years old.

9. Plaintiff Ronald Ullrich is a 55–year old male.

10. Plaintiff was hired in 1984 as a computer systems engineer. He worked at the company for 31 years.

11. Plaintiff became a vice president in 2003.

12. Plaintiff was well-regarded within the company in the early 2000s because of the business he brought in, including several large contracts.

13. Plaintiff became Chief Operating Officer ("COO") in January 2008, and his duties included managing business development opportunities.

14. From 2008 onward, plaintiff was predominantly a non-billable or "overhead" employee, though he occasionally performed billable work.

15. Plaintiff reported to Douglas Rhodes from 2008 to 2011.

16. Plaintiff has known Weston Rhodes ("Rhodes"), for many years.

17. Rhodes joined defendant in 2003 and became a full-time employee in 2004.

18. Rhodes became Director of Administration, then a vice president, and finally CEO in 2011. Plaintiff began to report to Rhodes at that time.

19. Before Rhodes became CEO, plaintiff believed that he might one day become CEO. After Rhodes became CEO, plaintiff believed that his chances of becoming CEO had decreased.

20. In early 2014, Rhodes and Carolyn Cahoon, the Director of Human Resources, received complaints from employees that plaintiff was arriving late, leaving early, missing for long stretches during the day, not responding or responding late to emails, and exhibited some difficulty in responding to questions. This behavior was atypical for plaintiff.

21. Plaintiff's supervisees complained to Rhodes about plaintiff's poor management style and incomplete work product.

22. Cahoon and several other employees reported that plaintiff smelled like alcohol.[1]

1. Plaintiff asserts that, as of March 2014, he had not noticed a change in his own behavior; that he never consumed alcohol on the job;

23. Unknown to defendant, plaintiff was taking several medications that were causing side effects such as slurred speech, dizziness, dry mouth, and sleeplessness.

24. Cahoon and Rhodes met with plaintiff on March 6, 2014 to discuss their concerns about his behavior. At the meeting, Cahoon and Rhodes told plaintiff that he was "spacey" and asked what was wrong with him.

25. During the meeting, plaintiff stated that he was taking medications, including Ambien and Trazodone, and suggested that his medications might be causing his behavioral problems.

26. Cahoon and Rhodes asked plaintiff to confirm with his doctor that his medications would not affect his ability to work.

27. Cahoon and Rhodes also asked plaintiff if the company could help him at all, but plaintiff declined their offer.

28. Cahoon received a fax from Stephanie Miller, a physician's assistant at Ashburn Family Practice, on March 14, 2014. Miller stated that plaintiff "was seen at our office on 3–12–14 to review medications and was deemed Medically Cleared. There is no evidence of effect [sic] in his performance at work in his timeliness, responsiveness, and attention to detail. If you have any

questions please do not hesitate to contact me."

29. Cahoon sent two follow-up letters to Ashburn Family Practice to clarify the March 14, 2014 fax. Cahoon felt that the initial fax did not answer her questions, such as whether plaintiff was taking these drugs for the first time and whether the drugs might have caused plaintiff's behavior. Cahoon also stated in one letter that plaintiff had said during the meeting that he "suffered from anxiety related to his son and had trouble sleeping." Pl.'s Ex. 13. Cahoon wanted to know if plaintiff might need some sort of accommodation.

30. In May 2014, defendant received a complaint from a client, the FAA, about one of defendant's employees. At the time of the complaint, Rhodes was out of town, so Rhodes asked plaintiff via email to handle the complaint, telling plaintiff: "Find out. Conduct our own investigation get HR involved and let me know today the preliminary findings. May need to get legal involved to either protect our employee or [defendant]." Pl.'s Ex. 4.

31. Rhodes expected plaintiff to be proactive about addressing the complaint. At a minimum, Rhodes expected plaintiff to speak directly with the employee, the FAA, and the project's prime contractor. In-

that he was at home on the day that Cahoon noticed he smelled like alcohol; and that Cahoon never confronted plaintiff personally when she purportedly smelled alcohol on his breath. Plaintiff's asserted facts, however, do not create a genuine dispute of material fact. Even though plaintiff did not notice any change in his behavior, he does not contest that Cahoon received employee complaints about plaintiff's behavior. And even if plaintiff

was not at work on the day that Cahoon allegedly smelled alcohol on him, plaintiff does not dispute that other employees reported that plaintiff smelled like alcohol. Finally, whether Cahoon confronted plaintiff about the fact that he smelled like alcohol is immaterial because neither party argues that this alcohol incident had anything to do with his demotion or ultimate termination.

stead of investigating the complaint himself, plaintiff asked other company employees to do so. Plaintiff did not speak to the FAA, the prime contractor, the employee, or legal counsel.

- Plaintiff does not directly dispute those facts, but asserts that plaintiff asked the project manager to speak to the employee because the manager was on site, and also reached out to human resources about contacting legal counsel because plaintiff did not know how to contact them.

- The project manager informed plaintiff that the FAA needed to complete an inquiry into the complaint. Plaintiff wrote Rhodes that day to update him on the situation and detail the various conversations plaintiff had about the complaint.

32. Rhodes was not satisfied with plaintiff's handling of the complaint, telling plaintiff that plaintiff had abdicated his responsibility.

33. Rhodes met with plaintiff, Gail Parmentier, and Cahoon to discuss plaintiff's leadership on Monday, May 12, 2014. After Parmentier, Cahoon, and Rhodes spoke with plaintiff, Rhodes spoke with plaintiff one-on-one.

34. Rhodes told plaintiff that plaintiff did not have the leadership qualities Rhodes expected to see in a high-level manager and that his handling of the FAA complaint fell short of expectations, and as a result Rhodes would re-work plaintiff's job duties to focus more on non-management responsibilities.

35. Immediately after the May 12, 2014 meeting with Rhodes, plaintiff told Cahoon that he wanted to file a formal harassment complaint against Rhodes.

36. Plaintiff's complaint was based on alleged age discrimination.

37. Cahoon conducted an investigation and concluded that there had been no unlawful harassment against plaintiff.

38. Cahoon provided plaintiff and Rhodes with memoranda summarizing her findings.[2]

39. Plaintiff did not file any other internal complaints.

40. After the harassment investigation concluded, Cahoon gave plaintiff a written copy of his revised job duties. Plaintiff's job duties changed, but he remained a vice president.

41. Plaintiff's primary responsibility would now be "business development and capture management." Pl.'s Ex. 7.

42. Defendant reduced plaintiff's base salary by $50,000 a year, but plaintiff could earn a large bonus for bringing in new business. The "success criteria" for his new role was submitting 10 different proposals for new business opportunities with NRC, or new customers, within the next year, with a revenue goal of $4 million within the year.

- Plaintiff adds that in his new role, he was excluded from business meetings that he had previously conducted, and that defendant removed him from proposals that he

2. Cahoon's memorandum stated that the "legitimate concerns" about plaintiff's performance substantiated Rhodes' "conclusion that [plaintiff] has not been demonstrating the necessary leadership and accountability associated with the COO role, and that a change in his duties and compensation to a lower level is appropriate." Pl.'s Ex. 5.

had previously worked on. Plaintiff also notes that NRC was an older customer that had no upcoming work. Finally, plaintiff notes that defendant had previously averaged six new business opportunities per year.

- Plaintiff also asserts that his salary adjustment occurred outside the normal cycle for salary review.

43. Defendant did not hire anyone to take over plaintiff's COO job duties, although some of his duties were reassigned to Gail Parmentier (age 69), Larry Hottot (age 61), and Devon Musselman (age 49).

44. Defendant hired Musselman in August 2014. Musselman is 49 years old. Plaintiff felt that Rhodes would show favoritism toward employees that were his "buddies," including Musselman. Pl.'s Ex. 1 at 36.

45. Musselman had previously served as defendant's Director of Human Resources from 2007 to 2010, and was hired to manage defendant's administrative departments and customer relationships.

46. Rhodes made Musselman plaintiff's supervisor in January 2015. Rhodes felt that plaintiff did not like or appreciate Rhodes, noting how plaintiff filed a harassment complaint against him. Rhodes states that he wanted plaintiff to have the greatest chance of success, and because Rhodes felt that he could no longer be a neutral party toward plaintiff in judging plaintiff's performance, Rhodes reassigned him to Musselman.

47. Plaintiff filed a charge of discrimination with the EEOC in March 2015. Rhodes and Cahoon were aware of the charge.

48. In 2015, defendant bid on a contract with the FAA's National Airspace System Integration and Support Group (the "NISG Contract").

49. Plaintiff was listed on the NISG Contract proposal as the Engineering Project Manager, which meant that he would have become almost 100% direct billable.

50. In early 2015, Rhodes observed that defendant's overhead was increasing in comparison to its revenue, and if the trend continued he would have to cut costs, potentially by laying off employees.

51. In August 2015, defendant lost the bid for the NISG Contract.

52. In August 2015, the FAA informed defendant that the FAA would not renew a large contract (the "PTSS Contract") with defendant.

53. The PTSS Contract would end on September 20, 2015.

54. The employees staffed on the PTSS Contract would no longer be direct billable employees, and would therefore become overhead until they could find new billable work.

55. Because of the loss of the NISG Contract and the end of the PTSS Contract, Rhodes determined that defendant needed to reduce its overhead to remain competitive.

56. Rhodes attempted to move as many employees as possible from overhead to direct billing, and also considered outsourcing some departments.

57. Rhodes selected individuals for layoffs who were earning higher salaries but would not likely become direct billable employees in the near future.

58. This was not the first time defendant determined that overhead employees would have to find direct billable work or be laid off.

59. In early September 2015, Rhodes determined that defendant would lay off plaintiff and another employee, Richard Marks (age 58) if they were unable to move to direct billable work in the near future. Rhodes emailed all managers on September 9, 2015 to tell them about the layoffs. The email stated that the layoffs were required due to lower-than-anticipated revenue.

- Plaintiff asserts that Rhodes decided to lay off plaintiff on September 9. That is true, but the email also states that if plaintiff or Marks "obtain[ed] direct work that covers their cost prior to their separation then we will revisit their involuntary separation." Pl.'s Ex. 10.

60. Musselman contacted plaintiff and asked plaintiff to submit a work plan by September 21, 2015 identifying (i) direct billable work that the plaintiff could immediately perform or (ii) a project that defendant had a high chance of procuring. Musselman offered to help plaintiff in this regard, but plaintiff declined his help.

- Plaintiff states that another overhead employee, Larry Hottot (age 61) needed to become directly billable but was not required to submit a work plan. Another employee, Woody Long (age 62) was also not required to submit a work plan.

61. Plaintiff emailed his work plan to Musselman on September 20, 2015. Much of his work plan simply repeated internet articles about business development.

62. Plaintiff's work plan did not identify any direct billable work that plaintiff could immediately perform. The work plan referenced only one possible contract that defendant could procure—the FAA Air Traffic Engineering and Program Support ("ATEPS") Small Business Set-Aside, which was not a reasonable opportunity at the time, as the request for proposal ("RFP") had not even been released.

- Plaintiff points out that the draft RFP for this contract was set to release on September 21, 2015, and that in plaintiff's experience such contracts could go from the request stage to beginning work in as little as two weeks.

63. The ATEPS Contract was not released for a bid until March 10, 2016, and defendant later determined that it could not bid for the contract.

64. After Musselman received plaintiff's work plan, Musselman informed Rhodes that plaintiff had not identified direct billable work or a contract that defendant had a high chance of procuring and on which defendant could immediately bid.

65. On September 21, 2015, Musselman told plaintiff that he would be laid off because plaintiff's work plan did not include any direct billable work or identify an immediate contract opportunity.

- Plaintiff asserts that defendant began preparing the paperwork for plaintiff's termination on September 16, 2015. This is correct, but an email from human resources also shows that defendant prepared plaintiff's paperwork only in the event that plaintiff did not present a qualifying work plan on Monday, September 21, 2015. Def.'s Supp. Ex. D (Doc. 49-4).

- Cahoon and Rhodes had four or five conversations between May 2014 and May 2015 in which Rhodes discussed potentially firing plaintiff due to performance issues. Cahoon testified that Rhodes told Cahoon that "life would be easier" if "this distraction [*i.e.*, plaintiff's EEOC complaint] from his business would go away," as it took time, money, and legal effort to resolve. Pl.'s Ex. 2 at 61.

66. Musselman sent plaintiff a follow-up letter on September 25, 2015 about plaintiff's lay-off.

- Neither Hottot nor Long were laid off, even though they did not become direct billable until November 2015. The record shows, however, that Hottot and Long were only partially on overhead, and that both employees had already worked with their managers to secure direct work and increase direct billing by September 2015.

67. Plaintiff's business development role was not filled after his layoff, and instead various vice presidents and project managers increased their business development activities.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. A "fact is material if it might affect the outcome of the suit under the governing law." *Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296, 300 (4th Cir. 2016) (internal quotation marks omitted). A "dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation marks omitted). The movant bears the burden of showing an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once the movant has met this burden, the non-moving party, to defeat the motion, must set forth specific facts showing that there is a genuine issue for trial. *Covenant Media Of SC, LLC v. City Of N. Charleston*, 493 F.3d 421, 436 (4th Cir. 2007). The facts must be construed "in the light most favorable" to the non-movant, and all reasonable inferences must be drawn in the non-movant's favor. *Vannoy*, 827 F.3d at 300. Only "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Plaintiff brings two claims for unlawful discrimination under the ADEA and ADA based on his May 2014 demotion and September 2015 termination, and brings another two claims under the ADEA and ADA for unlawful retaliation based on his filing of the internal harassment complaint in May 2014 and the EEOC complaint in March 2015. Plaintiff does not contend that he can establish age or disability discrimination through direct evidence, and accordingly both parties agree that the familiar *McDonnell Douglas*[3] burden-shifting scheme applies here. Under the first step of that scheme, the plaintiff "has the burden to establish a prima facie case." *Lettieri v. Equant Inc.*, 478 F.3d 640, 646 (4th Cir. 2007). If plaintiff can establish a prima face case of discrimination, the "burden shifts to the employer at the second step to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* (internal quotation marks omitted). The burden returns to the plaintiff "to show that the employer's proffered permissible reason for taking an

---

3. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

adverse employment action is actually a pretext for discrimination." *Id.* (internal quotation marks omitted). The plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination." *Id.* (internal quotation marks and brackets omitted). At the third step, "the burden to demonstrate pretext merges with the ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination." *Id.* at 646–47 (internal quotation marks and brackets omitted). Plaintiff's ADEA discrimination claim is addressed first, followed by his ADA discrimination claim, and, finally, his ADEA and ADA retaliation claims are discussed together because the same standard governs both retaliation claims.

### A.

■ The ADEA prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The plaintiff "must prove, with reasonable probability, that but for the age of the plaintiff, the employment decision adverse to the plaintiff would not have been made." *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1417 (4th Cir. 1991). To establish a prima facie case of age discrimination, plaintiff must prove that he: (1) was protected by the ADEA, (2) suffered an adverse employment action, (3) "was performing his job at a level that met his employer's legitimate expectations" at "the time of" the adverse employment action, and (4) was replaced by a substantially younger worker. *Mitchell v.*

*Data Gen. Corp.*, 12 F.3d 1310, 1315 (4th Cir. 1993): *see also Dugan v. Albemarle Cty. Sch. Bd*, 293 F.3d 716, 721 (4th Cir. 2002). Defendant does not dispute that plaintiff, who is over 40, is protected by the ADEA,[4] and concedes that the May 2014 demotion and September 2015 termination were adverse employment actions. As a result, the only disputed elements are whether plaintiff met defendant's legitimate expectations and whether his duties were taken over by a substantially younger employee.

■ With respect to whether plaintiff satisfied defendant's legitimate expectations before the May 2014 demotion, "the prima facie case requires the employee to demonstrate that [the plaintiff] was qualified in the sense that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance, absolute or relative." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 514–15 (4th Cir. 2006) (internal quotation marks omitted). Because a plaintiff must "show by a preponderance of the evidence that he met the employer's legitimate job expectations to prove his prima facie case, the employer may counter with evidence defining the expectations as well as evidence that the employee was not meeting those expectations." *Id.* at 515–16. Rhodes established his expectations for plaintiff's handling of the FAA complaint in an email, instructing plaintiff to: "Find out. Conduct our own investigation get HR involved and let me know today the preliminary findings. May need to get legal involved to either protect our employee or [defendant]." Pl.'s Ex. 4. Furthermore, plaintiff does not contest that Rhodes, at a minimum, expected plaintiff to speak directly with the employee, the FAA, and the project's prime con-

---

**4.** *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996).

tractor. And plaintiff does not contest that he failed to do that, and instead had other employees reach out to the employee, FAA, and prime contractor. Furthermore, the memorandum Cahoon prepared after concluding her investigation into plaintiff's harassment complaint stated that:

There have been legitimate concerns about [plaintiff's] performance generally (including the attentiveness and timeliness issues that were addressed in March), the need to redo much of [plaintiff's] work, the apparent lack of confidence the PMs have in [plaintiff] his failure to ensure that two new business development employees were hired, and the most recent incident regarding the investigation into allegations involving a company employee.

Pl.'s Ex. 5 at 4. Cahoon added that these incidents "substantiate [Rhodes'] conclusion that [plaintiff] has not been demonstrating the necessary leadership and accountability associated with the COO role, and that a change in his duties and compensation to a lower level is appropriate." *Id.* at 4–5.

Given these undisputed facts, plaintiff cannot show that he satisfied defendant's legitimate expectations. To begin with, plaintiff offers no evidence that Rhodes' expectations of how plaintiff should handle the FAA complaint "were a sham designed to hide the employer's discriminatory purpose" and therefore illegitimate. *Warch*, 435 F.3d at 518 (internal quotation marks omitted). Instead, plaintiff argues that there is a genuine dispute of material fact on this issue only because, in his own opinion, he met Rhodes' expectations by delegating authority to other employees. The Fourth Circuit has made clear, however, that it "is the perception of the decision maker which is relevant, not the self assessment of the plaintiff." *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996) (internal quotation marks omitted). And plaintiff's assertion that his previous success at the company in the 2000s should be taken into account is also irrelevant, because it is the employee's performance at the time of the adverse employment action that matters. *See Lovelace v. Sherwin–Williams Co.*, 681 F.2d 230, 244 (4th Cir. 1982) ("We think it important to hold employee-claimants in discharge, demotion, reassignment, and like cases to the burden of showing that performance at the requisite level of employer expectations continued to a time reasonably close to the time of the challenged employer action."). As a result, no reasonable jury could find that plaintiff satisfied defendant's legitimate expectations at the time of his demotion given these undisputed facts about plaintiff's performance. *See King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (noting that the defendant "offered substantial evidence that [plaintiff] was not in fact meeting legitimate job performance expectations, chronicling in detail [plaintiff's] poor performance and his supervisors' numerous concerns").

Even if plaintiff were able to satisfy the third required element of the ADEA prima facie case, he still cannot establish a prima facie case with respect to his May 2014 demotion because he cannot show that his duties were reassigned to substantially younger employees. Plaintiff does not dispute that defendant did not hire anyone to take over plaintiff's COO duties, and instead his duties were reassigned to Gail Parmentier (age 69), Larry Hottot (age 61) and Devon Musselman (age 49). Because Parmentier and Hottot are older than plaintiff, who is 55, the question is whether someone six years younger than plaintiff qualifies as "substantially younger" under the ADEA.

As plaintiff correctly points out, there is no bright line for what age qualifies as "substantially younger." *See O'Connor v.*

*Consol. Coin Caterers Corp.*, 517 U.S. 308, 311–13, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). The Sixth Circuit has stated that "[a]ge differences of ten or more years have generally been held to be sufficiently substantial to meet the requirement of the fourth part of [an] age discrimination prima facie case." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336–38 (6th Cir. 2003) (citing published and unpublished decisions from the Second, Third, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits). The Sixth Circuit also pointed out that the "overwhelming body of cases in most circuits has held that age differences of less than ten years are not significant enough to make out the fourth part of the age discrimination prima facie case." *Id.* at 338–39 (citing published and unpublished decisions from the First, Sixth, Seventh, Eighth, Ninth, Tenth, and D.C. Circuits). A district court in this circuit has stated that the "courts of this circuit, including the Fourth Circuit Court of Appeals, have for the most part followed these principles," but the Fourth Circuit has not done so in a published opinion. *DeBord v. Wash Cty. Sch. Bd*, 340 F.Supp.2d 710, 714 (W.D. Va. 2004).[5]

Although the Fourth Circuit has not ruled directly on this issue in a published opinion, the undisputed facts indicate that plaintiff cannot meet his burden on this element. Plaintiff does not dispute that some of his duties were reassigned to Parmentier (age 69) and Hottot (age 61), nor does he dispute that defendant employs (i) 70 people, 22 of whom are over 60 and 14 of whom are between 50 and 59 and (ii) that the average age of defendant's workforce is 50 years old. In other words, 51% of defendant's workforce is over 40 and thus protected by the ADEA. And plaintiff does not adduce any direct evidence of age discrimination. Given these facts, plaintiff cannot "create the required inference that the termination was based on age discrimination." *DeBord*, 340 F.Supp.2d at 715–16 (holding that the plaintiff, who was seven years older than her replacement, could not satisfy this element because she offered no evidence of direct discrimination and 71% of defendant's workforce was protected by the ADEA); *see also Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 512 (4th Cir. 1994) (stating that the plaintiff's evidence of age discrimination was "tenuous" where "younger supervisors were retained after [plaintiff] was fired, [but the] undisputed evidence also indicate[d] that a majority of the remaining supervisors were in the protected class").[6] As a result, plaintiff fails to satisfy the fourth required element of the prima facie ADEA case because the facts do not indicate that defendant demoted him due to his age.

■ Even if plaintiff could establish a prima facie case of age discrimination, his ADEA claim would still fail because defendant had a legitimate, non-discriminatory reason for the May 2014 demotion and plaintiff cannot establish pretext. *Lettieri*, 478 F.3d at 646. Defendant's burden at the second step is one of production, not persuasion. *Warch*, 435 F.3d at 514. Defendant satisfies that burden here because its

---

**5.** *See, e.g., Cramer v. Intelidata Techs. Corp.*, 168 F.3d 481, at *3, 1998 WL 911735 (4th Cir. 1998) (unpublished table decision) ("The person who assumed the duties that remained following Cramer's termination was only five years younger than Cramer, and not therefore 'substantially younger' than Cramer in the absence of additional evidence."); *Rhymer v. Yokohama Tire Corp.*, 106 F.3d 391, at *3, 1997 WL 14143 (4th Cir. 1997) (unpublished table decision) ("Purdy, age 41, was substantially younger than Rhymer, who was 54.").

**6.** The Fourth Circuit also noted in *Birkbeck* that "the mere fact of replacement by a younger employee is not dispositive of age discrimination," because "[if] it were, it would transform the ADEA into something akin to a strict seniority protection system." 30 F.3d at 512.

proffered reason for demoting plaintiff—his mishandling of the FAA complaint—is a legitimate, non-discriminatory reason for demotion. *See King*, 328 F.3d at 151 (stating that failure to meet "job performance expectations" is a "legitimate ... motive").

The burden then shifts back to plaintiff to show pretext, which plaintiff can do "either by showing that [the defendant's] explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of age discrimination." *Mereish v. Walker*, 359 F.3d 330, 335 (4th Cir. 2004) (internal quotation marks omitted). Plaintiff argues that defendant's reason for demoting him is pretextual for basically the same reasons why he argues that he was satisfying defendant's legitimate job expectations—that, in his own view, plaintiff appropriately handled the complaint. As explained above, however, plaintiff's views on that issue are irrelevant. *See Evans*, 80 F.3d at 960–61. Plaintiff also argues that defendant showed preference to Musselman, who is six years younger than plaintiff, by hiring Musselman, putting him on the executive team, and making him plaintiff's supervisor. But plaintiff's own facts show, even in the light most favorable to plaintiff, that Rhodes favored Musselman not because of Musselman's age, but because Musselman and Rhodes were "buddies." Pl.'s Ex. 1 at 36. *See Dugan*, 293 F.3d at 723 ("[A] personal friendship between the decisionmaker and another individual is insufficient to establish unlawful discrimination."). In sum, plaintiff has failed to meet his burden of showing that his poor performance was not the true reason for his demotion, and accordingly he cannot show that age was the "determining factor" behind defendant's decision to demote him. *Duke*, 928 F.2d at 1417.

■ The next issue is whether plaintiff's September 2015 termination violated the ADEA. The parties' arguments with respect to whether plaintiff can make out a prima facie case of discrimination based on his termination are largely the same as their arguments for the May 2014 demotion, and accordingly the same analysis applies. Plaintiff cannot show that he was meeting defendant's legitimate expectations before he was fired because his work plan was not up to par. The only counterargument plaintiff makes is that, in his view, his work plan was sufficient. As stated above, it is the employer's perspective that matters on this issue, not the plaintiff's. *See Evans*, 80 F.3d at 960–61. And plaintiff cannot satisfy the fourth element of the prima facie case because his duties were reassigned to vice presidents and project managers, all of whom are between 61 and 74 years old, except for two (Musselman, who is 49, and another employee, who is 44). Because the majority of supervisors were protected by the ADEA, the fact that two younger employees also took over some of plaintiff's duties is not enough to show age discrimination. *See Birkbeck*, 30 F.3d at 512.

Even if plaintiff were able to establish a prima facie case of age discrimination with respect to his termination in September 2015, his ADEA claim still fails because defendant had a legitimate, non-discriminatory reason for the termination and plaintiff cannot show that defendant's reason was pretextual. Defendant's proffered reason for terminating plaintiff is that the company was facing a revenue shortfall, which prompted Rhodes to mark plaintiff and one other overhead employee for lay-offs unless they could secure direct billable work or identify a viable contract opportunity that defendant could immediately pursue. After plaintiff failed to secure direct billable work or identify an immediate contract opportunity, he was laid off. As a result, defendant satisfies its burden of production at this step because terminating plaintiff due to a revenue shortfall is a

legitimate, non-discriminatory reason. *See Mereish*, 359 F.3d at 335 (stating that "strategic business decision[s] constitute[ ] a legally sufficient justification for ... termination," and specifically noting that addressing "adverse financial conditions" is a legitimate reason for termination) (internal quotation marks omitted).[7]

Because defendant has met its burden of production, plaintiff must show that the proffered reason was pretextual. Plaintiff argues that there is a genuine issue of material fact as to whether his work plan was insufficient because he identified a potential contract opportunity that could have become directly billable in a short amount of time. Plaintiff acknowledges, however, that the RFP for the contract had not even been released when he submitted his work plan, which not only meant that defendant could not immediately bid on the contract, but also prevented defendant from assessing whether the contract was truly viable. Clearly, Rhodes did not consider the work plan sufficient, and it is the employer's perspective that matters when assessing whether a proffered reason for termination is pretextual. *See DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) ("[W]e have repeatedly explained that it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.") (internal quotation marks and brackets omitted). Plaintiff's argument that two other employees, Larry Hottot and Woody Long, were not terminated even though they also needed to become directly billable is belied by the fact that they had already secured direct billable work when plaintiff was terminated. Furthermore, defendant clearly did not favor younger workers by retaining Hottot and Long, who are 61 and 62, whereas plaintiff is 55.

Defendant has put forward "reason[s] for [demoting and terminating] [ ] plaintiff not forbidden by law," and as a result it is inappropriate to "decide whether the reason[s] [were] wise, fair, or even correct, ultimately, so long as [they] truly [were] the reason[s] for plaintiff's [demotion and termination]." *Id.* (quotation marks omitted).[8] Indeed, the Fourth Circuit has made clear that "Title VII is not a vehicle for substituting the judgment of a court for that of the employer," and that a court does not "sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." *Id.* at 298–99 (internal quotation marks omitted). Defendant's decision to demote plaintiff and ultimately fire him may not have been "wise, fair, or even correct," but the facts viewed in the light most favorable to plaintiff do not show that defendant's proffered reasons for demoting and firing plaintiff were false and that age was the real reason for his demotion and termination. *See id.* (internal quotation marks omitted). As a result, granting summary judgment to defendant is appropriate on plaintiff's ADEA discrimination claim.

### B.

▇▇▇ Plaintiff also contends that his May 2014 demotion and September 2015 termination violated the ADA. The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to ...

---

7. *See also Birkbeck*, 30 F.3d at 513 ("The ADEA was not intended to obstruct the ability of a commercial enterprise to make necessary adjustments in the face of economic challenges.").

8. *See also Mereish*, 359 F.3d at 339 ("It is not our place to second-guess the soundness of ... managerial decisions under the guise of the ADEA. Our role is much more circumscribed; we are concerned only with ensuring that decision-makers are not improperly motivated by discriminatory animus.").

discharge ... [or] other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To survive summary judgment, plaintiff must show that (1) he "was a qualified individual with a disability," (2) he suffered an adverse employment action, (3) he was satisfying his employer's legitimate expectations at the time of the adverse action, and (4) the circumstances surrounding the adverse action "raise a reasonable inference of unlawful discrimination." *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012); *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 57–58 (4th Cir. 1995). Defendant argues that plaintiff cannot show that he is a qualified individual with a disability or that the circumstances surrounding the May 2014 demotion and September 2015 termination raise a reasonable inference of unlawful discrimination.[9]

The ADA provides that a disability can take any of three forms: "(1) a physical or mental impairment that substantially limits one or more major life activities (the 'actual-disability' prong); (2) a record of such an impairment (the 'record-of' prong); or (3) being regarded as having such an impairment (the 'regarded-as' prong)." *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 328 (4th Cir. 2014) (internal quotation marks omitted); *see also* 42 U.S.C. § 12102(1). Plaintiff is proceeding under the "regarded as" prong, which requires him to establish "that he ... has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). The ADA further provides that the "regarded as" prong does not apply "to impairments that are

transitory and minor," with a transitory impairment defined as "an impairment with an actual or expected duration of 6 months or less." *Id.* § 12102(3)(B). ADA regulations provide that a defendant seeking to show that an impairment is transitory and minor cannot succeed by "demonstrating that it subjectively believed the impairment was transitory and minor; rather, [the defendant] must demonstrate that the [perceived] impairment ... would be ... both transitory and minor." 29 C.F.R. § 1630.15 (2011). Defendant argues that plaintiff cannot satisfy this element because he can point only to Rhodes and Cahoon's comment that he was "spacey," and that even if this comment shows that Rhodes and Cahoon perceived plaintiff as disabled, then the disability was only transitory and minor.

The Fourth Circuit has not ruled on what qualifies as a "transitory and minor" impairment. Two district courts within this circuit have concluded that a plaintiff can satisfy this element by showing that an employee's supervisors questioned the employee's ability to work and made the employee apply for disability. *See Bordonaro v. Johnston Cty. Bd. of Educ.*, 938 F.Supp.2d 573, 579 (E.D.N.C. 2013) (concluding that plaintiff alleged sufficient facts to show she was "regarded as being disabled, as she was several times excused from bus driving duty and was told that she would need to apply for short term disability if she could not return to driving duty"); *Chamberlain v. Valley Health Sys., Inc.*, 781 F.Supp.2d 305, 311 (W.D. Va. 2011) (concluding that a jury must decide the issue of whether plaintiff's disability was transitory and minor where plaintiff showed that her supervisor insisted that plaintiff "was completely unable to

---

**9.** Defendant does not specifically argue that plaintiff failed to fulfill defendant's legitimate expectations at the time of either the demotion or termination, but the analysis on this

element is the same as the analysis for plaintiff's ADEA discrimination claim. *See infra* Part II. A.

work at the hospital as a result of her vision problem," and that the supervisor required her to apply for leave).

Given the *Bordonaro* and *Chamberlain* decisions, the record in this case reflects that plaintiff has adduced sufficient evidence to allow plaintiff to survive summary judgment on this element. After Rhodes and Cahoon received reports about plaintiff's atypical behavior, they had a meeting with him in which plaintiff volunteered that he was taking medications that might be causing his behavior. Neither Cahoon nor Rhodes asked plaintiff to apply for medical leave, but they did require him to send a doctor's note showing that he was medically cleared to work. Cahoon wanted to know whether plaintiff would require an accommodation for any disability he might have, which could indicate that she viewed any potential disability as more than a transitory issue. Finally, Cahoon was aware that plaintiff had admitted to having anxiety and problems sleeping, which could objectively be viewed as more than transitory and minor issues. Viewed in the light most favorable to plaintiff, those facts are sufficient to show that defendant regarded plaintiff as disabled and that his impairment was more than transitory and minor, which means that plaintiff can show that he had a qualified disability.

Even though plaintiff can satisfy the first required element of the ADA prima facie case, he cannot prove a prima facie case because the circumstances surrounding his May 2014 demotion or September 2015 termination do not create a reasonable inference of discrimination. Beginning with the May 2014 demotion, plaintiff met with Rhodes and Cahoon in March 2014 about plaintiff's atypical behavior. There are no facts indicating that Rhodes or Cahoon raised plaintiff's perceived disability with plaintiff after the March 2014 meeting. And most importantly, plaintiff was demoted only after he mishandled the FAA complaint in May 2014. The undisputed facts show that plaintiff's demotion, not his perceived disability, was the "but for" cause of his demotion, as the ADA requires. *See Gentry v. East West Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 235–36 (4th Cir. 2016) (holding that the ADA imposes a " 'but for' causation standard"). Because the facts indicate that plaintiff was demoted only as a result of his mishandling of the complaint, the circumstances surrounding his demotion do not create an inference of disability discrimination.

Plaintiff also cannot show that the circumstances surrounding his termination in September 2015 create a reasonable inference of discrimination: indeed, the connection between his perceived disability and termination is tenuous at best. Rhodes and Cahoon met with plaintiff about his odd behavior in March 2014, but he was not terminated until September 2015; after the March 2014 meeting, there are no facts showing that Rhodes and Cahoon raised concerns with plaintiff about his behavior, "spaciness," or any other perceived disability. Plaintiff argues that he was essentially "set up to fail" because his new job duties had difficult revenue goals, and he also argues that defendant made the decision to fire him as early as September 9, 2015. Even construing those facts in the light most favorable to plaintiff, however, there is no indication that they have any connection to plaintiff's perceived disability.

Even if plaintiff could establish a prima facie case of ADA discrimination based on his May 2014 demotion and September 2015 termination, his ADA discrimination claim still fails to survive summary judgment because, for all the reasons stated above with respect to plaintiff's ADEA claim, defendant had legitimate, non-discriminatory reasons for demoting and terminating plaintiff and plaintiff cannot show

that those reasons were pretextual. *See infra* Part II.A.

## C.

 Plaintiff's final two claims are for retaliation under the ADEA and ADA. He contends that his May 2014 demotion was retaliation for filing his internal harassment complaint, and he also contends that his September 2015 termination was retaliation for filing his EEOC complaint in March 2015. The parties agree that, under both statutes, the plaintiff must show that he (1) engaged in protected activity, (2) suffered an adverse employment action, and (3) that "a causal connection existed between the protected activity and the adverse action" in order to make out a prima facie case of retaliation. *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998); *Reynolds*, 701 F.3d at 154. If plaintiff can make out a prima facie case of retaliation, defendant must show a legitimate, non-discriminatory reason for the adverse action, and the burden then shifts back to plaintiff to show pretext. *See Causey*, 162 F.3d at 803. Defendant does not contest the first two elements, so the parties focus only on whether plaintiff can show causation.

The first issue is whether a causal connection exists between plaintiff's demotion and his filing of an internal harassment complaint.[10] The undisputed facts show that Rhodes told plaintiff that he would have his job duties revised and his salary reduced at a meeting on May 12, 2014. Plaintiff filed his harassment complaint right after the meeting, and Cahoon concluded her investigation on May 22, 2014. The next day, Cahoon sent plaintiff an email describing his new role and salary.

Those undisputed facts do not support a causal connection between the harassment complaint and the demotion for the simple reason that Rhodes clearly decided to demote plaintiff *before* plaintiff filed the harassment complaint. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("To satisfy the third element, the employer must have taken the adverse employment action *because* the plaintiff engaged in a protected activity."). Furthermore, Cahoon's memorandum regarding her conclusions about plaintiff's complaint stated that his failure to meet performance standards substantiated Rhodes "conclusion that [plaintiff] has not been demonstrating the necessary leadership and accountability associated with the COO role, and that a change in [Plaintiff's duties and compensation] to a lower level is not inappropriate," which confirms that plaintiff was demoted because of performance issues, not due to retaliation. Pl.'s Ex. 6 at 4.

With respect to plaintiff's September 2015 termination, defendant argues that plaintiff cannot show a causal connection between the filing of his March 2015 EEOC complaint and his September 2015 termination because the six-month gap between the EEOC complaint and the termination, as well as the 16-month gap between the internal harassment complaint and the termination, are too long to create an inference of retaliation. The Supreme Court has stated that the "cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the

---

**10.** Plaintiff does not clearly argue in his brief whether this connection exists; indeed, it is not even clear that he is alleging retaliation based on the internal harassment complaint, as his amended complaint refers only to retaliation based on the EEOC complaint. At oral argument, however, plaintiff argued that his internal harassment complaint was a separate instance of protected activity that resulted in his demotion. As a result, that argument is addressed here.

temporal proximity must be very close." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (internal quotation marks omitted) (approvingly citing a Tenth Circuit case which held that a 3–month period was insufficient and a Seventh Circuit case which held that a 4–month period was insufficient). Similarly, the Fourth Circuit has approvingly cited a Tenth Circuit decision holding that a four-month gap between protected activity and termination is not enough for causation, and several unpublished decisions support that point.[11] *Causey*, 162 F.3d at 803 (citing *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997)). Under those precedents, defendant is correct that the six-month and 16–month gaps are too long to establish an inference of causation.

Because the six-month and 16–month gaps are not enough, by themselves, to establish causation, plaintiff must rely on additional evidence to show causation. *See Lettieri*, 478 F.3d at 650. The other evidence plaintiff points to is Rhodes' comment to Cahoon that plaintiff's complaint was a costly distraction to defendant's business.[12] Plaintiff argues that Rhodes'

comment, combined with the six-month gap, is sufficient to show causation under the Fourth Circuit's unpublished decision in *Coursey v. University of Maryland Eastern Shore*. In *Coursey*, the Fourth Circuit held· that a seven-month gap was sufficient to support an inference of causation where the employer "introduced the EEOC complaint into evidence before the Termination Panel," which was "highly suggestive of a causal link." 577 Fed.Appx. 167, 175 (4th Cir. 2014) (unpublished).[13] The record does not disclose when Rhodes made that comment to Cahoon, but it could not have been after May 2015, as Cahoon had left the company by then, and this was four months before plaintiff's termination. Moreover, Rhodes said nothing about plaintiff's EEOC complaint in his September 9, 2015 email informing several managers that plaintiff and another employee would be laid off due to revenue shortfalls. As a result, *Coursey* is inapposite and Rhodes' comments are not sufficient to establish causation.

Finally, even if plaintiff could establish a prima facie case, his ADEA and ADA retaliation claims would nevertheless fail because defendant had legitimate, non-dis-

---

**11.** *See Atkins v. Holder*, 529 Fed.Appx. 318, 321 (4th Cir. 2013) (unpublished) (four months insufficient); *Perry v. Kappos*, 489 Fed.Appx. 637, 643 (4th Cir. 2012) (unpublished) (three months insufficient); *Pascual v. Lowe's Home Ctrs.*, 193 Fed.Appx. 229, 233 (4th Cir. 2006) (unpublished) (three to four months is insufficient); *see also Swann v. US Foods, Inc.*, No. 1:14-cv-1409, 2015 WL 3793739, at *6 (E.D. Va. June 17, 2015) ("[C]ourts have consistently held that a period of three or four months between protected activity and adverse employment action is insufficient to establish a causal link between the two.").

**12.** Plaintiff also points to the fact that Rhodes put plaintiff under Musselman's supervision in January 2015 because Rhodes felt he could no longer be a neutral party toward plaintiff, but that event occurred before plaintiff filed

his EEOC complaint in March 2015, which means that it is immaterial to the causation inquiry. *See Dowe*, 145 F.3d at 657. And the January 2015 reassignment also occurred eight months after plaintiff's demotion, which is too long to establish an inference of causation. *See Causey*, 162 F.3d at 803. Plaintiff also points to the fact that after defendant terminated plaintiff, defendant investigated whether plaintiff kept confidential information on plaintiff's laptop and referred to the investigation into plaintiff's laptop as a criminal investigation. That fact is irrelevant because it occurred after plaintiff was terminated (and, obviously, after he was demoted).

**13.** The Fourth Circuit also stated that the employer's action was "undeniably flawed" and that it was "unwilling to condone such a practice." *Id.* at 175–76.

criminatory reasons for demoting and terminating plaintiff and he cannot establish that those reasons were pretextual. *See infra* Part II.A. As a result, his ADEA and ADA retaliation claims cannot survive summary judgment.

### III.

Accordingly, and for good cause,

It is hereby **ORDERED** that defendant's motion for summary judgment is **GRANTED**.

The Clerk is directed to send a copy of this Order to all counsel of record and to place this matter among the ended causes.