Filed:  March 26, 2007

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

───────────────

No. 05-1532
(CA-04-00838-JCC-LO)

───────────────

LORRAINE LETTIERI,

Plaintiff - Appellant,

versus

EQUANT INCORPORATED,

Defendant - Appellee.

───────────────

O R D E R

───────────────

The court amends its opinion filed March 5, 2007, as follows:

On page 1, attorney information section, line 1, and page 2, attorney information section, line 3 -- the name "ORLON" is corrected to read "OBLON."

For the Court - By Direction

   /s/ Patricia S. Connor

Clerk

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

LORRAINE LETTIERI,
　　　　　　*Plaintiff-Appellant,*

v.

EQUANT INCORPORATED,
　　　　　　*Defendant-Appellee.*

No. 05-1532

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(CA-04-00838-JCC-LO)

Argued: September 20, 2006

Decided: March 5, 2007

Before MICHAEL, Circuit Judge, and N. Carlton TILLEY, Jr.,
United States District Judge for the Middle District of North
Carolina, sitting by designation, and Thomas E. JOHNSTON,
United States District Judge for the Southern District of West
Virginia, sitting by designation.

---

Affirmed in part, reversed in part, and remanded by published opinion. Judge Michael wrote the opinion, in which Judge Tilley and
Judge Johnston joined.

---

## COUNSEL

**ARGUED:** Angela Hope France, ALBO & OBLON, L.L.P., Arlington, Virginia, for Appellant. Beverly W. Garafolo, BROWN, RAYS-

MAN, MILLSTEIN, FELDER & STEINER, L.L.P., Hartford, Connecticut, for Appellee. **ON BRIEF:** Seth C. Berenzweig, ALBO & OBLON, L.L.P., Arlington, Virginia, for Appellant. George L. Washington, Jr., EQUANT, INC., Oak Hill, Virginia, for Appellee.

## OPINION

MICHAEL, Circuit Judge:

The plaintiff, who appeals the summary judgment awarded to her former employer, claims that she was fired because of her gender and in retaliation for complaining of discrimination, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The appeal centers on whether the plaintiff has established a prima facie case on these claims. Based on our prior decision in *Miles v. Dell, Inc.*, 429 F.3d 480 (4th Cir. 2005), we hold that the plaintiff has made out a prima facie case of sex discrimination even though she was fired and her replacement was hired by different decisionmakers. We also hold that she has made out a prima facie case of retaliation because the evidence of her employer's recurring retaliatory animus is sufficient to establish a causal link between her complaint of discrimination and her termination. The Title VII claims are therefore remanded for further proceedings. Finally, the plaintiff also sues for $50,000 in sales commissions under her employment contract, and we affirm the district court's award of summary judgment to the employer on that claim.

I.

A.

Because the plaintiff, Lorraine Lettieri, was the non-moving party in the summary judgment proceedings, we state the facts, with reasonable inferences drawn, in the light most favorable to her. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Lettieri was employed by Equant Inc. and its predecessor company, Global One, from 1989 until July 2002. Both companies provided international data and voice telecommunications services. In July 2001 Global One

was acquired by, and merged into, Equant. Prior to the merger Global One had been partly owned by Sprint International Inc. (Sprint) and was the exclusive provider of certain telecommunications services to Sprint. Equant expected that Sprint would continue to be a customer after the merger.

Before the July 2001 merger Lettieri's position at Global One was Director of Alternate Sales Channel. During pre-merger planning, however, Equant decided that the team of Global One sales employees that Lettieri supervised would be reorganized into a new Equant unit called the Sprint Channel. The reorganization included the creation of a new management position, called Head of Sprint Channel. The person chosen for this position would lead the unit and coordinate the relationship between Equant and Sprint. In June 2001, a month before the merger, Lettieri interviewed for the Head of Sprint Channel position with Sean Parkinson, a Senior Vice President at Equant. During the interview Parkinson asked Lettieri many personal questions, including whether she had children, what her child care responsibilities were, and how her family felt about her weekly commute between Equant's headquarters in Reston, Virginia, and the family home in New York. Parkinson specifically asked Lettieri "how [her] husband handled the fact that [she] was away from home so much, not caring for the family." J.A. 423. Lettieri replied that she, her husband, and their children "all helped each other" and worked together to function as "a successful family." J.A. 424. Parkinson persisted, saying that he had "a very difficult time" understanding why any man would allow his wife to live away from home during the work week. *Id.* After the interview Lettieri contacted her then-supervisor, Jim Hamrick, to express her uneasiness about the gender stereotyping evident in Parkinson's questions and comments. Lettieri was convinced, as she emphasized to Hamrick, that Parkinson was not considering her professional qualifications.

In early July 2001 Parkinson called Lettieri to tell her that the Head of Sprint Channel job had been given to Equant employee Michael Taylor. Parkinson told her that Taylor had experience she lacked in running a freestanding, profit and loss organization, which might be the new business model for Sprint Channel. Parkinson also informed Lettieri that the key reason for Taylor's selection was that Taylor's children, unlike hers, were already raised, and Taylor and his wife

could make a committed move to Reston; Lettieri, on the other hand, still had child care and other family responsibilities in New York.

Later in July 2001 Lettieri wrote a letter to and talked with Lauren Stoll in Equant's Human Resources Department about her interview with Parkinson and his explanation of why Taylor had been chosen. Lettieri told Stoll that she was shocked by Parkinson's sexist presumptions and attitude; she did not ask for any specific action to be taken, and none was.

When Taylor took over as Head of Sprint Channel, he directly supervised two employees, Lettieri and Laure Travers, also a female middle manager. Lettieri continued with the title of Director, supervising a nationwide sales team of approximately fourteen people. In November or December of 2001, after working under Taylor for several months, Lettieri again complained to Human Resources, this time about Taylor's intolerable treatment of her. Lettieri reported that Taylor alternately screamed and cursed at her or gave her the "silent treatment." J.A. 522. Human Resources took no action on this complaint either.

Taylor's other female subordinate, Travers (based in New York), also had problems dealing with Taylor because of his sexist attitude and biased treatment "based upon gender stereotypes." J.A. 251. Although Travers was a managerial employee with an M.B.A., Taylor told her that he wished she worked in Reston where she could do his photocopying and that her only value was her ability to use her French charms on male customers. Twice (once in the fall of 2001 and once in April 2002) Taylor referred to Travers and Lettieri as "bitches" or "stupid bitches" in front of other Equant employees. J.A. 315, 687. Taylor's sexist comments were not limited to Travers and Lettieri. On as many as five or six occasions, in front of Lettieri and others, Taylor talked about the "physical attributes" ("her figure, her shape, [her] attractive[ness]") of Kimberly Wood, another female employee. J.A. 312. Once, in Lettieri's presence, Taylor said to Parkinson, "I'd like to get a piece of that [Kimberly Wood's] ass." J.A. 314.

The relationship between Equant and Sprint began to deteriorate following the merger. After a time Sprint requested that Equant's

Sprint Channel sales team stop the longstanding practice of interacting directly with Sprint's customers. Sprint also began looking to other vendors when Equant did not meet certain pricing demands.

In mid-December 2001 Taylor e-mailed Lettieri a suggested restructuring plan for the Sprint Channel unit that would have reduced her supervisory responsibilities and reassigned her to the New York office. This proposal came on the heels of Taylor's repeated suggestions to Lettieri that she should consider returning to New York to be with her family. Under Taylor's proposal Lettieri would no longer manage a nationwide sales team, but would work on large accounts in the New York area and serve as a coach to only two or three salespersons. Because the proposal called for her demotion, Lettieri immediately (on December 17) contacted the Director of Human Resources, Jill Hausner, to complain of discrimination in Taylor's plan and in the June 2001 interview with Parkinson. Lettieri also made the broader complaint that there was a "major problem w[ith the] way women are being perceived" in the organization and that the "management structure is biased against women." J.A. 262. Hausner immediately informed Taylor and Parkinson of Lettieri's complaints, but took no other action. Following Lettieri's return from the Christmas holidays, she met with Taylor to discuss the restructuring plan and her complaints. Although Taylor agreed not to implement his proposal, Lettieri described him as angry and red faced during the meeting.

Within weeks of Lettieri's December 17th discrimination complaints, Taylor took away significant aspects of her job responsibilities. At a mid-January 2002 meeting of the entire Sprint Channel sales team, Taylor announced that he was taking over Lettieri's role of leading the team. Specifically, Taylor said that he would be responsible for overall direction and strategy, he would be increasing his direct interaction with team members, he would be making direct contact with Equant's clients at Sprint, and he would be assuming all of Lettieri's pricing authority. Lettieri had previously exercised final pricing authority in over ninety percent of the deals Equant did with Sprint. Lettieri did not report her loss of job responsibilities to Human Resources because "no action was taken the first time [she] complained, and that all it did was create an atmosphere of more hostility." J.A. 575-76.

The Sprint Channel unit was generating lower than anticipated revenues in the first part of 2002. In February or March 2002 Taylor and Parkinson discussed terminating Lettieri. According to Parkinson, no decision was made at that time, but Lettieri was singled out because eliminating middle management would have been "the quickest way" to reduce costs in response to the disappointing returns. J.A. 1092. In April 2002 Parkinson, a Senior Vice President, left the company and was replaced by Paul Radochia. As soon as Radochia arrived, Taylor recommended cutting Lettieri's and Travers's positions. Taylor told Radochia that "he ha[d] big issues with [Lettieri]" and that "her role [was] not really needed." J.A. 264. The final decision to terminate Lettieri and Travers was reached in the first part of June 2002, but they were not told about it until July 8, 2002.

On June 14, 2002, after the decision to eliminate Lettieri's position had been made, Taylor e-mailed Radochia about a recently demoted male employee, Tony Avino. Taylor wrote that he had "had [his] eye on [Avino] as possible sales leadership replacement to LL [Lettieri] for some time." J.A. 192. If Avino had no disqualifying factors in his record, Taylor wanted to talk with Radochia about moving Avino into Lettieri's position. Radochia replied that Avino was a "poor performer" with other very negative attributes. *Id.* Radochia added, "we have [Lettieri] on the redundant list . . . that means [she] can not be 'replaced' for at least 6 months. I thought you [Taylor] were going to have all the sales people report to you and set up 'unofficial' team leaders." *Id.* Taylor then retreated, telling Radochia that the plan remained for the sales team to report to him (Taylor).

Lettieri was summoned to Equant's New York office for a meeting with Taylor on July 8, 2002. On that day a Human Resources representative took Lettieri to a conference room where they waited for Taylor. When Taylor arrived, he commented on Lettieri's attire, saying, "My don't you look pretty in pink," and, "I like girls that are dressed in pink." J.A. 626-27. The Human Resources representative then told Lettieri that her position was being eliminated effective immediately. Travers, the other female middle manager who reported directly to Taylor, was discharged the same day. Although Equant asserts that Lettieri's and Travers's positions were among hundreds eliminated during the year following the merger with Global One,

only Lettieri and Travers were targeted for termination in the Sprint Channel unit during this period.

As Taylor was thwarted in his effort to replace Lettieri with Avino, he assumed Lettieri's role of supervising the Sprint Channel sales team after she was fired in July 2002. Taylor thus performed his regular job as Head of Sprint Channel as well as the job of supervising the sales team until Equant hired Barbara Wellons as Head of Sprint Channel in February 2003. Wellons's title, Head of Sprint Channel, was the same as Taylor's. Wellons, however, took over Taylor's Head of Sprint Channel responsibilities, relieving him of the pivotal authority to set pricing for Sprint Channel products and services. Taylor was thus effectively demoted and left with Lettieri's former position of supervising the Sprint Channel sales team.

On April 10, 2003, two months after her arrival, Wellons asked for and received Taylor's resignation. Wellons hired Gregory DeMarco four days later, and DeMarco took over the responsibilities that Taylor had been most recently performing. DeMarco's title was Director, Sprint Channel Sales. Two Sprint Channel organizational charts, one showing Lettieri's role and one showing DeMarco's, demonstrate that DeMarco filled Lettieri's old position. The charts show both as managers of the Sprint Channel sales team and holding director-level positions. Moreover, immediately after DeMarco was hired, he contacted Lettieri because "he was told by his management that [she] knew how to do [his] job better than anybody, and that he should come talk with [her] and learn how to do the job from [her]." J.A. 640. Lettieri met with DeMarco in April 2003 and gave him advice about discharging the responsibilities of her old position, the position DeMarco had just assumed, called Director of Sprint Channel Sales.

### B.

Lettieri's termination prompted her to file charges of sex discrimination and retaliation with the EEOC, which issued a right to sue letter. She then filed a timely action against Equant alleging Title VII sex discrimination, Title VII retaliation, and breach of contract. The last claim seeks $50,000 in unpaid commissions that Lettieri believes were due to her under her employment agreement with Equant. Equant moved for summary judgment on all three claims, and the

motion was granted. The district court concluded that Lettieri's gender discrimination claim failed for two reasons: first, Lettieri's alleged replacement by DeMarco was not probative of discrimination because he was hired by different decisionmakers than those who fired her, and second, she did not proffer sufficient evidence to show that she had been replaced at all. *Lettieri v. Equant, Inc.*, 367 F. Supp. 2d 958, 965 (E.D. Va. 2005). Lettieri's retaliation claim was rejected because the court concluded that Lettieri could not show a causal connection between her complaint of discrimination and her termination. *Id.* at 966. Finally, the court held that Lettieri's breach of contract claim failed because she had not shown that Equant had an obligation to pay her the disputed commissions. *Id.* at 969. Lettieri appeals the three summary judgment rulings.

## II.

Lettieri seeks to avoid summary judgment and establish her claim for Title VII sex discrimination by using the three-step, or burden shifting, "pretext" method of proof laid out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). At the first step the plaintiff has the burden to establish a prima facie case. A Title VII plaintiff using the standard formulation for the prima facie case meets this burden by showing that: "(1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc). If the plaintiff establishes her prima facie case, the burden shifts to the employer at the second step "to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* At the third step the burden returns to the plaintiff to show that "the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Id.* Specifically, the plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). At this last step "the burden

to demonstrate pretext 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination.'" *Hill*, 354 F.3d at 285 (quoting *Burdine*, 450 U.S. at 256).

## A.

Lettieri carried her burden on the first three elements of the prima facie case, but the district court held that she failed on the fourth element to show that she was replaced by someone outside of her protected class. *Lettieri*, 367 F. Supp. 2d at 964-65. The district court concluded that Lettieri could not satisfy this last element of the prima facie case for two reasons. First, "[b]ecause a completely different management team hired DeMarco, the subsequent action by these different decision-makers cannot be imputed back" to Taylor and anyone else who decided to fire Lettieri. *Lettieri*, 367 F. Supp. 2d at 965. Second, the district court did not believe that Lettieri's evidence showed that she was actually replaced by DeMarco. The court brushed aside the fact that Lettieri and DeMarco both held the title of Director, concluding that "Lettieri provides no evidence of DeMarco's daily duties at Equant so she has not shown that he replaced her." *Id.*

On appeal Lettieri argues that the district court erred in concluding that she failed to proffer sufficient evidence to allow a trier of fact to find that she was ultimately replaced by DeMarco. More fundamentally, however, she argues that the district court erred in requiring her to make this showing as part of her prima facie case. According to Lettieri, our holding in *Miles v. Dell, Inc.*, 429 F.3d 480 (4th Cir. 2005), relieves her of the requirement to show replacement outside of her protected class in order to make out a prima facie case. We agree with Lettieri, as we explain below.

In *Miles* the female Title VII plaintiff, who asserted that she was fired because of her sex, was replaced by a female hired by a different decisionmaker. The district court granted summary judgment to the employer, holding that the plaintiff had failed to establish the fourth element of her prima facie case because she was replaced by a female. We reversed, establishing what we called "the different-decisionmaker exception to the fourth prong of the Title VII prima facie case" — an exception that allowed the plaintiff to establish a

prima facie case, even though one manager fired her and another hired her female replacement. *Id.* at 483.

We noted in *Miles* that "in order to make out a prima facie case of discriminatory termination, a plaintiff must *ordinarily* show that the position ultimately was filled by someone not a member of the protected class." *Id.* at 486 (quoting *Brown v. McLean*, 159 F.3d 898, 905 (4th Cir. 1998) (emphasis added in *Miles*). There are "exceptions to this rule in limited situations." *Brown*, 159 F.3d at 905. "One clear [exception] is when the defendant hires someone from within the plaintiff's protected class in order 'to disguise its own act of discrimination toward the plaintiff.'" *Miles*, 429 F.3d at 488 (quoting *Brown*, 159 F.3d at 905-06). We recognized another exception in *Miles* for the case "wherein the firing and replacement hiring decisions are made by different decisionmakers." *Id.* at 489. In such a case, we said, "the second individual's hiring decision has no probative value whatsoever as to whether the first individual's firing decision was motivated by the plaintiff's protected status." *Id.* In other words, even if the female plaintiff could have shown that the second decisionmaker hired a male to replace her, the replacement hiring decision would not have contributed to a presumption of gender discrimination on the part of the first decisionmaker, who fired the plaintiff. *See id.* The solution, we held, was simply to relieve the plaintiff of the burden to "show as part of her prima facie case that she was replaced by someone outside her protected class" when "the firing and hiring decisions were made by different decisionmakers." *Id.*

In light of our reasoning in *Miles*, the district court in this case was correct in its implicit understanding that the sex (here, male) of the person chosen by a second decisionmaker to fill the female plaintiff's vacant position does not assist in creating a presumption of gender bias on the part of the first decisionmaker, who fired the plaintiff. The district court nevertheless erred in failing to apply the exception created in *Miles*, which relieves a plaintiff like Lettieri of the burden to show replacement outside of her protected class as part of the prima facie case. Because it is uncontested that Lettieri has satisfied the first three elements of the prima facie case, and *Miles* relieves her of

showing the traditional fourth element, we conclude that she has met her burden at the first step of the *McDonnell Douglas* analysis.[1]

B.

Because Lettieri has made out a prima facie case and established a "legally mandatory, rebuttable presumption" of unlawful discrimination, the burden shifts to Equant to assert a nondiscriminatory explanation for Lettieri's termination. *Burdine*, 450 U.S. at 254 n.7. Equant has met its burden of production by proffering evidence that Lettieri was terminated because her position was "not really needed" and was therefore eliminated to provide a quick antidote for revenue shortfalls. J.A. 264. With this explanation the burden shifts back to Lettieri to show that Equant's stated reasons for her termination "were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. In order to show pretext at this third step of the *McDonnell Douglas* framework, Lettieri must proffer sufficient evidence to allow a trier of fact to find that she was replaced, and thus her position was not eliminated, as Equant claimed.

Lettieri has made this showing. Immediately after the decision to fire Lettieri was made in early June 2002, Taylor, in an e-mail to Radochia, sought to replace Lettieri with a male. Radochia, however, advised Taylor that he could not replace Lettieri for at least six months because she was "on the redundant list." J.A. 192. Taylor was thus forced to take on Lettieri's job duties in addition to his own from July 2002, when Lettieri was fired, until February 2003, when Wellons replaced Taylor. At that point, Wellons assumed Taylor's upper-level management responsibilities and effectively demoted Taylor, who continued to perform Lettieri's mid-level management position of supervising the Sprint Channel sales team. In short, Lettieri's job re-emerged as a separate position when Wellons arrived. Lettieri was thus replaced, temporarily by Taylor in February 2003 and ultimately by DeMarco in April 2003 when he was hired as Director of Sprint Channel Sales. Organizational charts showed that DeMarco and Lettieri had the same position because they were both at the director level and supervised the Sprint Channel sales team. Finally, when DeMarco

---

[1]At the last step of *McDonnell Douglas* Lettieri will still be required to proffer sufficient evidence to show that she was replaced.

was hired, he immediately contacted Lettieri because "he was told by his management that [she] knew how to do [his] job better than anybody, and that he should come talk with [her] and learn how to do the job from [her]." J.A. 640. Lettieri met with DeMarco and gave him advice about fulfilling his responsibilities as her successor. These facts are sufficient to allow a trier of fact to find that Lettieri was replaced and to reject Equant's explanation that Lettieri was fired because her position was eliminated.

To this point, Lettieri has made out a prima facie case of sex discrimination and offered ample evidence to discredit Equant's proffered nondiscriminatory reason for her termination. Because Equant has not offered "uncontroverted independent evidence that no discrimination [ ] occurred," Lettieri's showing is sufficient to permit a "trier of fact to infer the ultimate fact of [intentional] discrimination from the falsity of the employer's explanation." *Reeves*, 530 U.S. at 147-48. Lettieri, however, relies on more than her prima facie case and the falsity of Equant's explanation in attempting to establish that she was the victim of discrimination.

Lettieri also puts forward the kind of evidence that we have determined to be sufficient to defeat an employer's motion for summary judgment: "evidence that clearly indicates a discriminatory attitude at the workplace and . . . illustrate[s] a nexus between that negative attitude and the employment action." *Brinkley v. Harbour Rec. Club*, 180 F.3d 598, 608 (4th Cir. 1999). There is powerful evidence showing a discriminatory attitude at Equant toward female managers — particularly female managers who have children at home and commute long distances. This evidence would allow a trier of fact to conclude that these discriminatory attitudes led to Lettieri's ultimate termination. Senior Vice President Parkinson rejected Lettieri for the Head of Sprint Channel position in large part because he believed that women should not live away from home during the work week and that Lettieri should work close to her home in New York and not in Equant's headquarters in Reston, Virginia. Taylor, who was chosen to head up the Sprint Channel unit, agreed with Parkinson. As Lettieri's direct supervisor, Taylor repeatedly suggested to her that she should consider returning to New York to be with her family. Eventually, Taylor attempted to demote Lettieri and transfer her to New York. After Human Resources informed Taylor of Lettieri's complaint of sex dis-

crimination by him and Parkinson, he gave up on his plan to transfer her, but within weeks stripped her of significant job responsibilities. Taylor and Parkinson, who was also aware of Lettieri's allegations, then began discussions regarding her termination. Taylor claimed that Lettieri's role was not needed but nonetheless tried to replace her with a man. In due course, Taylor summoned Lettieri to her firing, where she was told that she "look[ed] pretty in pink" and that her job was being eliminated. J.A. 626. As we have already indicated, Lettieri has proffered sufficient evidence to show that the job elimination explanation was simply a cover for discrimination.

There is sufficient evidence in this case for a trier of fact to conclude that Lettieri was the victim of illegal gender discrimination. Accordingly, the district court erred in granting summary judgment to Equant on Lettieri's Title VII sex discrimination claim.

## III.

Lettieri next contends that the district court erred in granting summary judgment to Equant on her claim of Title VII retaliation. We also evaluate this claim under the *McDonnell Douglas* burden-shifting framework. *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 650 (4th Cir. 2002). At the time the district court considered Equant's motion, establishing a prima facie case of retaliation in this circuit required a plaintiff to show that: "(1) she [had] engaged in protected activity; (2) the employer took adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action." *von Gunten v. Maryland*, 243 F.3d 858, 863 (4th Cir. 2001).[2] Equant contested only the third

---

[2]Recently, in *Burlington N. & Sante Fe Ry. Co. v. White*, 126 S. Ct. 2405 (2006), the Supreme Court rejected our circuit's formulation of the second element of the prima facie case. The Court held that "the anti-retaliation provision . . . is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 2412-13. The anti-retaliation provision, the Court said, "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 2414. Thus, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from mak-

(causation) element in the summary judgment proceedings, and the district court held that Lettieri's evidence was too speculative to show a causal connection between her December 2001 discrimination complaint to Human Resources and her July 2002 termination. We conclude, however, that Lettieri proffers sufficient probative evidence to satisfy the causation element of her prima facie case.

Equant argues that Lettieri cannot rely on mere temporal proximity to establish a causal connection between her complaint and her termination because of the passage of seven months between these two events. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close[.]") (internal quotation marks and citation omitted). Equant nonetheless acknowledges that other relevant evidence may be used to establish causation. *See Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998). In cases where "temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000) (internal quotation omitted). Specifically, evidence of recurring retaliatory animus during the intervening period can be sufficient to satisfy the element of causation. *Id.*; *see also Miles*, 429 F.3d at 490 (noting that our "determination [in *Causey*] that a thirteen month interval was sufficient to negate the causal inference depended on the absence of other evidence of retaliation"). In this case Lettieri does not rely on temporal proximity; rather, to establish causation, she points to continuing retaliatory conduct and animus directed at her by Taylor and Parkinson in the seven-month period between her complaint and her termination.

---

ing or supporting a charge of discrimination." *Id.* at 2415 (quotation marks and citations omitted). *Burlington Northern* does not affect our analysis because the second element is not an issue in this appeal. Lettieri was fired and thus satisfied the stricter "adverse employment action" formulation rejected by the Supreme Court.

Lettieri contacted Hausner in Human Resources on December 17, 2001, to report gender discrimination by Taylor and Parkinson. Over the next two days Hausner conveyed Lettieri's complaints to the two men. After Lettieri lodged her complaint, Taylor gave up on his plan to transfer her to New York. But the very next month (January 2002) Taylor stripped Lettieri of significant job responsibilities. He reduced her supervisory responsibilities over the sales team and took away her authority to set prices and meet directly with Sprint clients. These steps made it easier for Taylor to take the position later that Lettieri was not needed and should be terminated. Before long, in February or March 2002, Taylor and Parkinson began discussions about firing Lettieri. This was well before Equant asked managers such as Taylor to look for positions that could be eliminated. Right after Radochia took over Parkinson's role in April 2002, Taylor informed Radochia that he had "big issues with [Lettieri]" and that "her role [was] not really needed." J.A. 264. After the decision was made to terminate Lettieri in June of 2002 because her position was supposedly redundant, Taylor immediately sought approval to hire a replacement for Lettieri.

These intervening events — which occurred regularly after Lettieri's complaint and can reasonably be viewed as exhibiting retaliatory animus on the part of Taylor and Parkinson — are sufficient to show a causal link between Lettieri's complaint and her termination. *See Farrell*, 206 F.3d at 281. Accordingly, we hold that Lettieri has established a prima facie case of retaliation.

The remainder of the *McDonnell Douglas* analysis for Lettieri's retaliation claim proceeds as it did under her discrimination claim. We therefore conclude, for the reasons stated in part II.B, *supra*, that there is sufficient evidence for a trier of fact to conclude that Lettieri was the victim of illegal retaliation when she was fired. As a result, the district court also erred in granting summary judgment to Equant on Lettieri's Title VII retaliation claim.[3]

---

[3]At oral argument Lettieri advanced a new theory of retaliation purportedly based on the Supreme Court's *Burlington Northern* decision, which was issued after the conclusion of briefing in this appeal. Lettieri argues that *Burlington Northern* makes clear that Taylor's decision to

IV.

Finally, Lettieri challenges the district court's grant of summary judgment to Equant on her breach of contract claim for $50,000 in sales commissions. Lettieri alleges that she and one of her subordinates won a contract with United Parcel Service (UPS) that was worth $3.5 million to Equant. It is undisputed, however, that Lettieri's subordinate who was responsible for the UPS account failed to report any new UPS order to Equant, and no such order was shown on Equant's order tracking system. The district court thus concluded that there was no reported UPS order that entitled Lettieri to the commissions claimed. Lettieri attempts to circumvent the undisputed facts on appeal by arguing that the district court's decision on her contract claim is contrary to the law of the case doctrine.

Prior to the summary judgment proceedings before the district judge, a magistrate judge denied Equant's motion to amend its answer to assert as an affirmative defense Lettieri's failure to fulfill a condition precedent with respect to her contract claim. The condition was that "the salesperson managing the account [must] timely submit order information to Equant so that commissions could be calculated." J.A. 68. Equant's motion to amend was denied without written opinion. As Lettieri essentially concedes in her reply brief, the law of the case doctrine does not prevent a district judge from implicitly reconsidering a magistrate judge's earlier ruling in the same case. *See Hill v. BASF Wyandotte Corp.*, 696 F.2d 287, 290 n.3 (4th Cir. 1982) (stating that the law of the case doctrine is "not a matter of rigid legal rule, but more a matter of proper judicial administration"). In all events, Lettieri had ample opportunity, but failed, on summary judgment to rebut Equant's position that her subordinate had not submitted any record of a new UPS order. Thus, the district court was correct in granting summary judgment to Equant on Lettieri's contract

---

strip her of major job responsibilities in mid-January 2002 was a separate act of retaliation outlawed by Title VII. Because Lettieri has proffered sufficient evidence to make out a prima facie case under her original claim that her termination was the retaliatory act, we leave it to the district court to consider on remand whether Lettieri may proceed under this additional theory.

claim on the ground that "[n]o reasonable juror could conclude that Equant was required to pay the [commissions] that Lettieri now seeks." *Lettieri*, 367 F. Supp. 2d at 969.

## V.

In sum, we affirm the district court's order granting summary judgment to Equant on Lettieri's breach of contract claim. We vacate the order granting summary judgment to the company on the Title VII claims and remand for further proceedings on those claims.

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*