**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 22-1287**

─────────────

PETER J. MASSARO

       Plaintiff - Appellant

v.

FAIRFAX COUNTY

       Defendant - Appellee.

─────────────

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. T. S. Ellis, III, Senior District Judge. (1:20−cv−00929−TSE−TCB)

─────────────

Argued: January 23, 2024                       Decided: March 19, 2024

─────────────

Before WILKINSON, QUATTLEBAUM, and RUSHING, Circuit Judges.

─────────────

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Quattlebaum and Judge Rushing joined.

─────────────

**ARGUED:** Daniel Scott Crowley, HANNON LAW GROUP, LLP, Washington, D.C., for Appellant. Emily Kathryn Blake, MCGAVIN, BOYCE, BARDOT, THORSON & KATZ, P.C., Fairfax, Virginia, for Appellee. **ON BRIEF:** Heather K. Bardot, MCGAVIN, BOYCE, BARDOT, THORSON & KATZ, P.C., Fairfax, Virginia, for Appellee.

─────────────

WILKINSON, Circuit Judge:

Plaintiff Peter Massaro contends that his employer, the Fairfax County Police Department, transferred him to an inferior posting in retaliation for his filing a complaint alleging discrimination in departmental promotion practices. He sued Fairfax County, seeking relief under Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, and 42 U.S.C. § 1983. The district court granted summary judgment to Fairfax County on all claims and dismissed the case, holding that Massaro failed to establish the requisite causal connection between his initial discrimination complaint and his subsequent job transfer. For the following reasons, we affirm the judgment of the district court.

I.

A.

Because Fairfax County's motion for summary judgment was granted below, we recount the facts and all justifiable inferences arising from them in the light most favorable to Massaro on appeal. *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013). Massaro has been a police officer with the Fairfax County Police Department since 1996. From February 2018 to May 2020, Massaro was the supervisor of the firearms training range at the Fairfax Criminal Justice Academy (the "Academy"). There, Massaro "was responsible for training the entire Police Department, the Fairfax County Sheriff's Department, and the police departments for the towns of Vienna and Herndon, in the use of firearms." J.A. 9. By all accounts, his role was a significant one that came with a great deal of leadership responsibility.

2

Massaro, however, was frustrated. Twice he was passed over for promotion to First Lieutenant, even though he had passed the requisite examination and believed he was the most qualified candidate for the position. He was not selected in April 2018, nor was he selected in September 2018. To Massaro's chagrin, two women he saw as less qualified than him were promoted to First Lieutenant during these cycles: Marisa Kuhar and Loriann LaBarca.

Massaro took issue with Kuhar's promotion first. He believed that she lacked the requisite educational requirements and suspected that something nefarious was afoot in the Department. On September 26, 2018, Massaro filed a discrimination complaint with Fairfax's Office of Human Rights and Equity Programs (OHREP), alleging that Chief Edwin Roessler had promoted Kuhar instead of Massaro only because of Massaro's sex. He later amended this complaint to include similar claims of age and race discrimination. Investigators looked into Massaro's discrimination complaint and discovered that Kuhar's promotion had since been rescinded and deferred. While Chief Roessler had initially believed Kuhar possessed the credentials necessary for promotion, this was later revealed to be mistaken. A male officer was promoted in Kuhar's place, and her promotion was deferred until she could complete the required educational credits. Once investigators were apprised of this information, Massaro's grievance was dismissed on the grounds that he had not suffered an adverse employment action on which a complaint could be based. This decision was issued on October 4, 2018, and Massaro did not appeal it.

Another Second Lieutenant, Timothy Burgess, lodged a similar discrimination complaint against Chief Roessler around the same time. Burgess, too, asserted that he was

3

more qualified than candidates selected for First Lieutenant, and claimed that Chief Roessler failed to promote him due to his race, sex, and age. His complaint was tied to an earlier promotion cycle than the one central to Massaro's complaint. In it, he complained of the promotions of a white female, a black male, and an Asian male. OHREP and the Police Department's Internal Affairs Bureau (IAB) investigated Burgess's complaint, independently concluded that it was unfounded, and dismissed it.

Fast forward to May 2019—eight months after Massaro filed his complaint. Chief Roessler was looking to reform the Academy where Massaro worked after a series of concerning events, including an accidental firearm discharge, allegations that a range instructor used a racial slur against black police officers, and a widespread failure to follow departmental policies. As part of the reform efforts, Chief Roessler transferred Major Paul Cleveland to the Academy to take over as commander. He hoped Major Cleveland could get the place back on track.

But according to Massaro, Major Cleveland was sent to the Academy for a more sinister reason: to punish and ultimately get rid of Massaro as retribution for his discrimination complaint against Chief Roessler. Massaro testified that Major Cleveland, when asked why he had been transferred to the Academy, told Massaro that "your complaint against the Chief isn't helping you and isn't helping the situation." J.A. 1189. Massaro also pointed out that Major Cleveland had ignored Massaro's recommendations for candidates to fill open positions at the Academy and slotted in his own choices instead. In Massaro's eyes, this was further evidence that Major Cleveland had been sent to carry out Chief Roessler's retribution.

4

Major Cleveland also allegedly divulged his animus to others at the Academy. Massaro and two other officers recounted that Major Cleveland told a group of detectives that Massaro had a "target on his back" due to "the promotion complaints," which the detectives took to mean the September 2018 discrimination complaint. J.A. 1594; J.A. 1997; J.A. 2014.

Tensions further escalated upon First Lieutenant Loriann LaBarca's visit to the Academy. LaBarca, as noted, was one of the women promoted to First Lieutenant in 2018. On May 22, 2019, Massaro saw LaBarca standing in the common room of the firing range, and the two of them struck up a conversation in his office. LaBarca shared that departmental leadership wanted to showcase her promotion on social media, but that she was uncomfortable with the idea, as she felt it would call too much attention to her. Massaro testified that at this point, LaBarca asked him if he believed she only got promoted because she was a woman. Massaro replied that there were others who were more qualified than her to be First Lieutenant, and that he believed sex was a "decisive factor" in her promotion. J.A. 1176. This comment enraged LaBarca, and she stormed out of his office.

LaBarca turned to departmental leadership to address the incident. She first relayed the conversation to her direct supervisor and then to Major Cleveland. Major Cleveland testified that he felt that he "didn't have an option" but to report the incident to IAB, as what LaBarca was telling him was an "HR-specific type complaint[]" that was "pretty severe." J.A. 672. Major Cleveland disclosed the matter to the IAB investigators on duty, who conducted preliminary interviews with LaBarca and Massaro and decided to launch a formal investigation into the matter.

5

The next day, IAB investigators Second Lieutenants Andrew Hirshey and Dana Ferreira sat down with Massaro to get to the bottom of what had happened. The conversation went off the rails, leading to an incensed Massaro opining at length about why his confrontation with LaBarca was justified. "I don't understand why we have to pretend the commander has to be treated with kid gloves," he insisted. "[I]s she gonna be the one that leads us into the fight[?] Is she gonna pick up the bodies[?] [W]ho's really gonna lead the organization?" J.A. 918. He harangued, "[Y]ou don't learn [leadership] by watching people who are shitty leaders . . . . If you coddle her and you continue to coddle people that . . . have deficiencies, you're gonna have a deficient command staff." J.A. 919. According to Massaro, LaBarca "needs to grow the hell up and learn to be a commander [be]cause this is bullshit. To drag a man like me in here over this bullshit hurt feeling crap and threaten me with relief of duty and destroy my reputation and career is bullshit." J.A. 920. Massaro was inflamed, pacing about the room in a fury.

Major Cleveland was watching a live stream of the interview from another room. After the questioning was over, he entered the interview room and sat across the table from Massaro. According to Massaro's testimony, Major Cleveland asked him, "Didn't I tell you to stay calm?" When Massaro responded that he was merely defending himself against the accusations, Massaro alleges that Major Cleveland told him, "Well, you know what, Pete? I think my resume is as good as yours. What do you think about that?" Massaro alleged that Major Cleveland then leaned forward and said, "And another thing. I think that Loriann LaBarca makes a fine commander. What do you think about that?" J.A. 1212. According to Massaro, Major Cleveland then left the room.

6

When Hirshey and Ferreira returned, they told Massaro he would be relieved from duty. Hirshey then prepared a memorandum summarizing his conclusions, in which he recommended that Massaro be found in violation of two departmental policies. The first policy, Regulation 201.14, prohibited unlawful discrimination (the "Unlawful Discrimination Regulation"). The second policy, Regulation 201.13, mandated that employees "treat individuals . . . with respect, courtesy, and tact" (the "Human Relations Regulation"). Massaro attended a relief of duty hearing, after which he was placed on administrative leave. Chief Roessler also informed Massaro that he would be required to undergo psychological testing, as Massaro's behavior in the interview had given Chief Roessler "great cause for concern regarding [Massaro's] ability to perform [his] full duties as a police supervisor." J.A. 88.

Massaro appealed Hirshey's findings. The next step in the review process was a hearing before the IAB, over which Captain Michael Wall presided. Captain Wall reviewed the evidence presented to him and concluded that, while Massaro had not violated the Unlawful Discrimination Regulation, he did violate the Human Relations Regulation. "Objectively," Captain Wall found, "it is not respectful or tactful to tell a female employee that her promotion was based on her gender . . . . While Second Lieutenant Massaro is entitled to his opinion, it was inappropriate of him to direct it personally at Lieutenant LaBarca in the workplace." J.A. 161. Captain Wall recommended a one-day suspension as punishment for the violation. Massaro again appealed this decision.

The appeal was reviewed by Major Robert Blakely, who affirmed the finding that Massaro had violated the Human Relations Regulation. He agreed that Massaro should be

7

suspended. But he also felt he had "no choice but to recommend that [Massaro] be transferred from the Criminal Justice Academy," as his "position as the senior first-line supervisor at the Firearms Training Unit . . . is a one-of-a-kind position," given that it required Massaro to "oversee and coordinate the training of thousands of incumbent police officers annually, in addition to overseeing the training of our most vulnerable employees—police recruits." J.A. 549. Major Blakely also noted that this was Massaro's third recorded violation of the Human Relations Regulation. To leave Massaro in a position of supervisory authority could thus open the Department up to liability. Massaro again appealed.

The next stage of the appeal involved a hearing conducted by a three-member panel. One of the members was selected by the Police Department, one was selected by Massaro, and the third was selected by the first two members. Ten witnesses testified at the hearing. At the conclusion of the evidence, two of the panel members found that there was insufficient evidence to support a violation of the Human Relations Regulation. The third member issued a dissenting opinion, recommending that the charge and suspension be upheld, but finding the transfer unwarranted.

Finally, the case came to Chief Roessler's desk, who pursuant to state law was the final decisionmaker within the Department on such matters. *See* Virginia Code § 9.1–504 ("The recommendations of the hearing panel . . . shall be advisory only, but shall be accorded significant weight [by the chief executive officer of the law-enforcement agency.]"). On March 12, 2020, Chief Roessler reinstated the violation of the Human Relations Regulation and imposed a disciplinary transfer, reassigning Massaro to work the

8

night shift on the Patrol Bureau. He emphasized that Massaro, while on duty, "made unprofessional remarks to another employee which involved gender and degrading statements about this person's integrity as a commander." J.A. 1528. These statements were "disrespectful and unprofessional" and thus failed to show "respect, courtesy and tact" under the terms of the regulation. J.A. 1528. As for the disciplinary transfer, Chief Roessler noted that Massaro's actions "diminished the level of trust needed for any incumbent to hold a highly specialized supervisory position at the Academy" and thus a reassignment was necessary. J.A. 1534. Massaro wrote to the County Executive in charge of appeals, who deferred to Chief Roessler and upheld his decision. Over fierce objection by Massaro, he was transferred from the Academy.

## B.

Massaro sued Fairfax County in the United States District Court for the Eastern District of Virginia, alleging retaliation in violation of Title VII, the ADEA, and the First Amendment. After discovery, both parties moved for summary judgment. The court first addressed Massaro's Title VII and ADEA claims, finding that they failed because "the evidence [did] not show a causal relationship between Massaro's protected activity and the adverse employment action Massaro suffered." *Massaro v. Fairfax County*, No. 1:20-CV-0929, 2022 WL 464556, at *7 (E.D. Va. Feb. 15, 2022). Instead, "the record show[ed] that the disciplinary actions taken against Massaro were the result of a lengthy investigation process that had nothing to do with Massaro's September 2018 complaint." *Id.* at *8. Similarly, on the First Amendment claim, the court found that "the record contains no evidence to warrant a reasonable jury to conclude that Massaro's protected speech was a

9

substantial factor in the Police Department's decision to discipline Massaro." *Id.* The district court then granted summary judgment to Fairfax County on all of Massaro's claims. Massaro timely appealed.

## II.

## A.

We review a grant of summary judgment de novo. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Bostic v. Schaefer,* 760 F.3d 352, 370 (4th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Libertarian Party of Va.,* 718 F.3d at 313 (internal quotation marks omitted).

## B.

We first address Massaro's claims under Title VII and the ADEA, which are analyzed under the same framework. *Walton v. Harker*, 33 F.4th 165, 171 (4th Cir. 2022). Title VII prohibits an employer from (1) discriminating against an employee on the basis of sex, and (2) retaliating against an employee for complaining about past discrimination or retaliation. 42 U.S.C. §§ 2000e-2(a)(1), 2000e-3(a). Similarly, the ADEA forbids retaliation against an employee who complains of age discrimination. *See* 29 U.S.C. § 633a(a).

## 1.

We begin by considering the well-settled framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To prevail under this framework, Massaro must first

establish a *prima facie* case of retaliation by showing that (1) he engaged in protected activity; (2) his employer took adverse action against him; and (3) a causal nexus existed between the protected activity and the adverse action. *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015).

The district court concluded that Massaro satisfied the first two requirements. He engaged in a protected activity when he filed his September 2018 discrimination complaint and suffered an adverse action at the hands of Chief Roessler, his employer, when he was transferred away from the Academy in March 2020. *See Massaro*, 2022 WL 464556, at *6. Fairfax County does not dispute these findings on appeal, and we see no need to revisit them. Therefore, the only issue on appeal relevant to this framework is whether Massaro can satisfy its causation element.

To do so, Massaro must show that Chief Roessler imposed the disciplinary transfer "*because* [he] engaged in a protected activity." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998). No reasonable juror could conclude that Massaro met this burden. The temporal lag between his discrimination complaint and his ultimate transfer was too great to support any inference of causation standing alone. And even taking the evidence in the light most favorable to Massaro, the record cannot support an inference that Massaro's transfer was the result of a scheme orchestrated by Chief Roessler to punish Massaro for his complaint. To the contrary: the evidence establishes that it was Massaro's subsequent actions that caused the transfer.

We have held that causation can be inferred when "the employer takes adverse employment action against an employee shortly after learning of the protected activity."

11

*Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 656 (4th Cir. 2017). But "the temporal proximity must be very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (internal quotation marks omitted). Here, the time lapse between Massaro's complaint and the imposition of his disciplinary transfer was roughly eighteen months— from September 2018 to March 2020. That is much too long to support a causal inference, and we have consistently denied such an inference even in cases with shorter gaps. *See Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) (thirteen months); *Penley*, 876 F.3d at 656 (eight or nine months); *Roberts v. Glenn Indus. Grp.*, 998 F.3d 111, 126 (4th Cir. 2021) (three months).

Even worse for Massaro, temporal proximity is a double-edged sword: "A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two." *Dowe*, 145 F.3d at 657. The significant length of time at issue in this case, then, cuts strongly against Massaro's assertions of a causal nexus.

It is possible, though difficult, for a plaintiff to overcome an absence of temporal proximity. In *Lettieri v. Equant, Inc.*, we held that "[i]n cases where temporal proximity between protected activity and allegedly retaliatory conduct is missing . . . evidence of recurring retaliatory animus during the intervening period can be sufficient to satisfy the element of causation." 478 F.3d 640, 650 (4th Cir. 2007) (internal quotation marks omitted). Massaro argues that he has made just such a showing. But his evidence fails to establish the pattern of retribution required.

12

In *Lettieri,* the plaintiff put forth evidence that she had been subjected to recurring retaliatory animus by her employer as part of a long-running plan to terminate her employment. The "very next month" after the plaintiff made her discrimination complaint, her supervisor "stripped [her] of significant job responsibilities," which "made it easier" for her supervisor "to take the position later that [the plaintiff] was not needed and should be terminated." *Id.* at 651. And indeed, "[b]efore long . . . discussions about firing [the plaintiff]" began. *Id.* After the plaintiff was terminated because "her position was supposedly redundant," her supervisor "immediately sought approval to hire a replacement" for her. *Id.* These intervening events, which "occurred regularly" after the plaintiff's complaint, could "reasonably be viewed as exhibiting retaliatory animus on the part" of her supervisors and were thus sufficient to show a causal nexus between her complaint and termination. *Id.*

No such recurring animus or choreographed scheme exists here. The gap between Massaro's discrimination complaint and the first alleged "step" in the conspiratorial chain Massaro concocts is too great, breaking the requisite continuity needed to establish causation. The first act of alleged retaliation Massaro can point to is Major Cleveland's transfer to the Academy, which did not occur until eight months after Massaro's complaint. We thus can scarcely say that there was "*continuing* retaliatory conduct" that "occurred regularly" between Massaro's complaint and disciplinary transfer. *Id.* at 650–51 (emphasis added). Massaro offers no possible explanation for why Chief Roessler would wait eight months before launching his asserted plan of revenge into action.

13

To the contrary, the record demonstrates that Massaro's asserted causal connection is altogether implausible, given the existence of a much more straightforward explanation for the discipline: Massaro's own conduct. The evidence amply supports the conclusion that Chief Roessler decided to discipline Massaro in light of the IAB investigation. In fact, there is no evidence that creates a genuine dispute of material fact as to Massaro's claim that Chief Roessler transferred him because of lingering animus. Chief Roessler issued his finding that Massaro had violated the Human Relations Regulation only after multiple layers of authority independently concluded the same and detailed their findings accordingly. Indeed, the appeal went through four stages before reaching Chief Roessler's desk, and the majority of those who reviewed the evidence recommended that Massaro be disciplined, without having had any prior contact with Chief Roessler about Massaro. In assessing the reports made by his colleagues, Chief Roessler understandably chose to agree with the majority conclusion that Massaro had violated the Humans Relations Regulation by making unprofessional and uncalled for remarks in the workplace. Chief Roessler was entitled to rely on these carefully documented judgments in reaching his own decision— that is, after all, the very purpose of an appeals structure with numerous stages of review.

Nor was Chief Roessler's decision to transfer Massaro so startling as to raise the alarm bells of pretext. Massaro had hurled insults against a higher-ranking colleague in the workplace, and, when questioned about the incident, launched into a tirade seeking to defend his own behavior. It is thus unsurprising that Chief Roessler felt he could not risk keeping Massaro in a role as sensitive as that of the supervisor of the firearms training range. Chief Roessler, as the leader of the Department, was therefore well within reason

14

when he concluded it was vital that Massaro be removed from this "one-of-a-kind position." J.A. 549. The record contains no evidence to dispute the conclusion, then, that Massaro's transfer was caused not by a complaint that had been resolved nearly two years prior, but by his own poor and alarming behavior in the workplace.

Further, it is unclear why Massaro would be targeted for filing a discrimination complaint when Burgess, who filed a similar complaint accusing Chief Roessler of the same practices, suffered no adverse employment action. The distinguishing factor between the two men is that Massaro later violated a departmental policy that justified discipline, whereas Burgess did not. This comparison casts into sharp relief how unlikely it is that Massaro's transfer was retaliation for his discrimination complaint.

In sum, Massaro's conjecture does not rise to the level of evidence that would allow a reasonable jury to conclude that Massaro had met the causation element of the *prima facie* case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We decline to force together links to create a causal chain that does not exist. There is simply not enough evidence of a nexus between his 2018 discrimination complaint and his 2020 disciplinary transfer, especially given the existence of a simple explanation for the reassignment: Massaro's intervening erratic behavior and violation of departmental policy.

2.

Massaro argues, however, that he has presented direct and indirect evidence of retaliation sufficient to allow his case to go before a jury. "To avoid summary judgment, the plaintiff must produce direct evidence of a stated purpose to discriminate and/or indirect evidence of sufficient probative force to reflect a genuine issue of material fact." *Rhoads*

15

*v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001). This requires "evidence of conduct or statements that both reflect directly [on] the alleged discriminatory attitude and that bear directly on the contested employment decision." *Id.* at 391–92. He points to two categories of evidence in support of this claim: actions taken by Major Cleveland that Massaro says evince retaliatory intent; and circumstances surrounding the investigation that he says reveal it to be a "setup." J.A. 1166. We find his arguments unpersuasive.

Massaro first attempts to show that Major Cleveland was motivated by retaliatory intent when he filed the IAB complaint. As evidence, he points to Major Cleveland's earlier statements that Massaro had a "target on his back" and that the range was under scrutiny at least in part because of Massaro's discrimination complaint. He highlights how Major Cleveland's first act as Commander was to undermine Massaro's authority to choose his own staff. He stresses that Major Cleveland chose to report Massaro to IAB just weeks after warning Massaro that the Academy was being watched by Chief Roessler. And he emphasizes how Major Cleveland allegedly mocked him at the end of his IAB interview. According to Massaro, a reasonable juror could interpret these actions as evidence that Major Cleveland was placed at the Academy by Chief Roessler to devise a pretextual investigation to retaliate against Massaro for the discrimination complaint.

We are not persuaded. Even though Major Cleveland allegedly told Massaro that his discrimination complaint raised alarm bells with departmental leadership, there were a variety of legitimate reasons Chief Roessler wanted to transfer Major Cleveland to the Academy that had nothing to do with Massaro, such as safety violations and allegations of racial discrimination. Further, while Massaro was offended by Major Cleveland's staffing

16

of the Academy, Massaro concedes that it was Major Cleveland's prerogative as Commander to do so. It is also undisputed that the candidates chosen were well qualified.

Moreover, to portray Major Cleveland's report to IAB of LaBarca's complaint as a "choice" is questionable. Not only did Major Cleveland testify that he felt obligated to report the complaint, but he was in fact required to do so by departmental regulations. *See* J.A. 639 ("I don't have a choice but to walk across the hallway to IA."); J.A. 1943 ("Any employee who has knowledge of other employees . . . violating any . . . Regulations of the Department . . . shall immediately bring . . . the matter to the attention of . . . the Internal Affairs Bureau (IAB)."). Massaro offers no evidence to create a genuine dispute of material fact on this point.

Further, Massaro's claim that Major Cleveland antagonized him after the IAB interview overstates what Major Cleveland actually said. But even accepting Massaro's characterization, the alleged harassment occurred after Hirshey had already decided he was going to relieve Massaro of duty, and Hirshey testified that Major Cleveland never told him what was discussed between he and Massaro in the interview room. Indeed, Major Cleveland played no active role in the IAB investigation at all once it began. The idea that Major Cleveland engineered a top-down conspiratorial scheme of retribution, then, is simply not plausible.

Massaro next argues that the IAB investigation itself was tainted and urges us to hold that he has provided compelling evidence that it was nothing more than a front for retaliation. His only evidence of this conspiratorial plot, however, is that Hirshey opined in his deposition that he thought the investigation could have been a way to "get rid" of

17

Massaro in retribution for his discrimination complaint. J.A. 828–29. But Hirshey's retrospective impression that the investigation may have been subterfuge is "mere speculation" and is not enough to create a triable issue of material fact. *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Indeed, Hirshey testified that neither Chief Roessler nor Major Cleveland interfered with his investigation, and that he would have reached the same conclusion about the Humans Relations Regulation regardless of whether the investigation was pretextual. The evidence suggests, therefore, that whatever Major Cleveland's intentions and impressions might conceivably have been, the investigation itself was conducted independently. Thus no "reasonable factfinder could conclude that a causal connection exists between the protected activity and the adverse action." *Dowe*, 145 F.3d at 657.

C.

We turn next to Massaro's claim under 42 U.S.C. § 1983 that he was retaliated against for exercising his free speech rights. In order to make out a First Amendment retaliation claim, a plaintiff must show that (1) he spoke as a citizen on a matter of public concern, rather than as an employee on a matter of personal interest; (2) the employee's interest in his expression outweighed the employer's "interest in providing effective and efficient services to the public"; and (3) the employee's speech was a "substantial factor" in the adverse employment action. *McVey v. Stacy*, 157 F.3d 271, 277–78 (4th Cir. 1998).

The first element of the test is the "threshold question." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 316 n.26 (4th Cir. 2006) (quoting *Rankin v. McPherson*, 483 U.S. 378, 384 (1987)). We must examine the "content, form, and context of a given

18

statement" to discern whether it qualifies as expression on a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). An employee's expression "involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Urofsky v. Gilmore*, 216 F.3d 401, 406 (4th Cir. 2000) (en banc). This excludes speech that is "of purely personal concern to the employee—most typically, a private personnel grievance." *Berger v. Battaglia*, 779 F.2d 992, 998 (4th Cir. 1985) (internal quotation marks omitted). At bottom, "[t]he focus is . . . upon whether the 'public' or the 'community' is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a 'private' matter between employer and employee." *Id.* at 999.

Massaro's promotion complaint made via an internal grievance process does not reflect a matter of public concern. While it is true that "discriminatory institutional policies or practices can undoubtedly be a matter of public concern," Massaro did not file his complaint to draw public attention to the problems he saw with the Department. *Brooks v. Arthur*, 685 F.3d 367, 372 (4th Cir. 2012). Instead, Massaro's real beef with the Department was that he, personally, was not promoted in lieu of a woman he viewed as unqualified. In other words, "his complaint [was] replete with I's and me's." *Id.*; *see* J.A. 65 ("*I* was the most qualified applicant for the position, however, *I* was not selected . . . . *I* believe Mr. Edwin Ro[e]ssler, Chief of Police, failed to promote *me* because of *my* sex.") (emphasis added); J.A. 68 ("It is not fair or right that *my* race, gender and age are now being used to keep *me* from the promotion due *me*.") (emphasis added). A qualm focused on one's own perceived mistreatment is not a matter of public concern. *Cf. Campbell v.*

19

*Galloway*, 483 F.3d 258, 270 (4th Cir. 2007) (finding complaint of sexual harassment involved a matter of public concern as it did not seek only to "resolve [complainant's] own personal problem" but rather detailed a pattern of harassment involving complainant, members of the public, and other female officers).

The "form and context" by which the complaint was made buttresses our conclusion, as "[t]he forum in which a petition is lodged will be relevant to the determination whether the petition relates to a matter of public concern." *Connick*, 461 U.S. at 147; *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 398 (2011). Indeed, "[a] petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context." *Guarnieri*, 564 U.S. at 398. Here, Massaro filed his complaint with OHREP, the County office charged with investigating grievances made by County employees. Massaro thus sought to improve his own station by following internal procedures, rather than by communicating the alleged discriminatory practices to the public through a more transparent and accessible medium. While he had every right to do this, such a strategy reflects the private nature of his speech. *Compare Pickering v. Bd. of Educ.*, 391 U.S. 563, 564–65 (1968) (public employee's letter to newspaper protected by First Amendment); *Perry v. Sindermann*, 408 U.S. 593, 598 (1972) (legislative testimony); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 284 (1977) (communication with radio station).

In sum, we cannot casually transform run-of-the-mill employee complaints into social and political commentaries backed by the full weight of the Constitution. To do so

20

would turn the workplace into a constitutional landmine, while offering public employees inflated speech rights not shared by their private counterparts. We therefore affirm the district court's grant of summary judgment to the County on Massaro's First Amendment claim.

## III.

None of the above is to suggest that we frown upon retaliation claims writ large. When properly substantiated, retaliation suits serve an essential purpose: Congress intended to ensure that employees are not subject to unjust punishment when they voice valid criticisms of discriminatory behavior by their employers. *See Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 175 (2d Cir. 2005) (emphasizing that "Congress enacted the anti-retaliation clause [of Title VII] to shield an employee from employer retaliation following the employee's attempt to challenge discriminatory conduct") (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)).

By the same token, courts addressing retaliation claims are not forbidden to consider the consequences of supervisory inaction. It will often be the case that the threat of a retaliation suit means the safest course for departmental leaders is to do little or nothing. Yet doing nothing may leave incapable, or worse, destructive individuals in place. And doing nothing may condemn institutions badly in need of reform to a future of ossification. Retaliation suits are meant to combat discrimination; they are not intended to induce paralysis or to stand as a roadblock to needed institutional change. What the Supreme Court said in the constitutional context must be equally true here: an employer need not "tolerate action which he reasonably believe[s] would disrupt the office, undermine his authority,

21

and destroy close working relationships" for fear of retaliation claims. *Connick*, 461 U.S. at 154.

The record shows Massaro's claim to be a case in point. Chief Roessler was confronted with an employee prone to bouts of unprofessional conduct who nonetheless was stationed in an important and delicate position of authority. Massaro, who was tasked with training numerous officers in the use of firearms, had demonstrated behavior at odds with a collegial work environment and inimical to the Police Department's chain of command. *See* J.A. 161; 523; 547–50. Compounding his gratuitous insult to a supervisor was a lack of impulse control quite incompatible with the discharge of his duties at the firing range. *See* J.A. 88; 915–23. Faced with such pressing circumstances, Chief Roessler made the call to shift Massaro to a position where he would not be able to make matters worse. We decline to stand in the way. Leaders of our public institutions must be able to engage in efforts to enhance the effectiveness of those workplaces they have been assigned to lead. Imposing liability for insubstantial retaliation allegations risks sending a message that simply filing a complaint is synonymous with securing tenure.

## IV.

For these reasons, the judgment of the district court is hereby

*AFFIRMED*.

22